## PLAX CORP. v. ELMER E. MILLS CORP.
### No. 50 C 234.

United States District Court
N. D. Illinois, E. D.
June 6, 1952.

Synnestvedt & Lechner and Alfred C. Aurich, Philadelphia, Pa., and Charles L. Byron, Chicago, Ill., for plaintiff.

Brown, Jackson, Boettcher & Dienner, Chicago, Ill., for defendant.

BARNES, Chief Judge.

This is a suit by Plax Corporation, a corporation of Delaware having a regular and established place of business at Hart-

ford, Connecticut, against Elmer E. Mills Corporation, a corporation of Illinois having a regular and established place of business at Chicago, Illinois, wherein the plaintiff charges that it owns and that the defendant has infringed four letters patent of the United States, as follows:

Letters Patent No. 2,128,239, issued August 30, 1938, to E. T. Ferngren on an application filed February 25, 1933, for a process of molding plastic materials;

Letters Patent No. 2,175,053, issued October 3, 1939, to E. T. Ferngren, on an application filed August 18, 1936, for a process and apparatus for working organic plastic material and producing containers therefrom;

Letters Patent No. 2,230,188, issued January 28, 1941, to E. T. Ferngren, on an application filed March 29, 1938, on a process of and apparatus for forming articles from plastic material; and

Letters Patent No. 2,349,177, issued May 16, 1944, to W. H. Kopitke on an application filed May 9, 1941, on a method of and apparatus for making blown plastic articles.

Ferngren Patent No. 2,128,239 states:

(page 1, column 1, line 1) "This invention relates to a process of blowing bottles and various other types of containers and shapes from materials in a plastic state.

"The material used may be of any nature, but preferably it should be in a viscous deformable plastic state, and have physical properties such as are possessed by certain molten materials, semi-solid solutions of matter and many organic materials dispersed in solvents and the like, and by plastic pastes, gels or sols, or by thermoplastic materials in general, by themselves, or when compounded and by many natural gums and synthetic products.

"The method itself is partly an extrusion procedure and partly a synchronized distending operation on the extruding material while the same is received in, or is caused to cover the walls of a mold element, or is otherwise formatively restrained, or caused to assume a given shape.

"The extruding process is capable of many modifications but as herein practiced, consists of advancing the plastic material as a hollow cylindrical stream, which stream is first caused to move confluently or to unite at a focus or point to form a tube closed at a point adjacent to the lower end of a receiving element or mold, and preferably near the bottom end of the mold cavity. By this means a predetermined mass of the plastic may be delivered upon the lower inner face of the mold used.

"The extruding material is also moved lengthwise of the mold cavity in such fashion that the extruding point of the annular stream is progressively moved or caused to register with successive points of the mold cavity, the movement being continuous, or intermittent, or variable, as required. Following this action the hollow cylindrical stream or body is extruded at a rate which may vary depending upon the wall thickness desired for different parts of the article being formed.

"In this connection if the girth or diameter at any one point or level of a mold cavity is more or less than at another point or level of the mold, the extruding stream velocity and its quantity may be suitably governed to insure proper thickness or strength of the container wall at all points or levels along the inner faces of the mold cavity. For example, in case of a bottle, the neck diameter is much less than the body diameter.

"The distending operation by the introduction of compressed air or the like within the hollow extruding material takes place after the extruded annular mass has been closed at its end and assists in the subsequent and continuous extrusion of the material to progressively expand it to conformity with the walls of the mold. As the emitting point of the progressively extruding tubular body traverses the entire mold cavity and, as in case of a bottle mold, arrives at the neck and mouth forming section of the mold, the walls of the hollow extrusion are

normally progressively forced outwardly and laid against the walls of the mold cavity thus forming the walls of a completed bottle.

"The distending or blowing agent may consist of a liquid or a gaseous medium under pressure, or it may be any fluid suitable for use with the material employed.

\* \* \* \* \* \*

(page 2, column 1, line 36) "The plastics now available, ranging from coal-tar and petroleum derivatives to casein and sugar derivatives, may be supplied from a compression chamber under suitable control as to direction, and at such speed and amount as desired or necessary, the equipment used for this purpose not being shown. The movement of the plastic material may also be reversed as may be necessary in carrying out the process.

\* \* \* \* \* \*

(page 3, column 1, line 62) "The plastic material introduced into the mold as herein described, if of the cellulose derivative type, may be compounded with many synthetic resins and plasticizers such as tricresyl phosphate. The material is heated to a point of having fluid mobility under pressure before it is advanced from a supply chamber through the passage of the tube, which normally should be kept at a temperature sufficiently elevated to prevent chilling of the material. Benzyl cellulose may be thus prepared and used for extrusion when heated.

\* \* \* \* \* \*

(page 4, column 1, line 16) "The step of causing or producing a confluent closing of the forward end of the extruding tubular stream by aid of suction from the tube (passage) inside of the tube or by any other means can be brought about before the tube reaches the lower position shown in figure 1, and in fact at almost any point during the downward movement of the tube through the opening and while it is passing downwardly through the mold cavity.

"The gathering into a body of the walls of the extruding (plastic) tube may then be brought about by reducing the air pressure in the passage at any predetermined instant, while simultaneously extruding the plastic material from the passage; both actions being caused to occur at the same moment the tube is moving downwardly or upwardly through the mold cavity. In some operations it is advantageous to cause this initial closing of the forward end of the hollow extruding body in the space above or outside the mold ring, at which time the tube may be stationary in the outside position relative to the mold or moving toward or away from the same.

"If the initial extrusion and gathering together is caused to occur in the mold cavity space, the bag may be formed very quickly and but little time consumed in laying the plastic wall and in moving the tube out of the mold cavity, as the extruding bag then is moving forwardly in advance of the tube as said bag is being blown and contacts with bottom wall of the mold, thus making it possible to terminate the downward thrust of the tube at some point relatively high in the mold cavity space, as may be predetermined by adjustments of the pressure or impulse producing agencies which control the rate of extrusion of the plastic and the mechanical means which control the speed and variations and directions of movements of the tube.

\* \* \* \* \* \*

(page 4, column 2, line 21) "Extrudable plastic materials formed of cellulose derivatives, dispersions, and solutions of other plastic materials with solvents of volatile character, and with or without plasticizers, may also be handled by this process in the making of hollow articles, bottles and other containers. My process is operative with any plastic material which may be extruded and subsequently expanded by blowing, using any fluid material to stretch the film made therefrom without rupture, and which may thereafter be rigidified."

Claims 7, 8, 19, 20, 21, 23 and 26 of this Ferngren Patent No. 2,128,239, are in suit. They are as follows:

"7. The process of making blown hollow articles from organic plastic materials which are expansible by blowing and thereafter capable of being rigidified, which comprises moving the plastic material confined in tubular form into a mold of the shape of the finished article, causing the end of said tubular material to gather at a predetermined position in respect to the mold and thereby closing such end, applying pressure within the tube of material to cause it to move out against the walls of the mold, and rigidifying the plastic material in position against said walls.

"8. The process of making blown hollow articles from organic plastic materials which are expansible by blowing and thereafter capable of being rigidified, which comprises moving the plastic material while in a plastic state in tubular form into a mold of the shape of the finished article, bringing the end of the tube of plastic material into contact with the bottom of the mold to close the end of the tube, and applying fluid under pressure to the interior of the closed tube to distend the walls thereof and bring them against the walls of the mold.

\* \* \* \* \* \*

"19. The process of making hollow articles from organic plastic materials which are expansible by fluid pressure and thereafter capable of being rigidified, which comprises extruding such a plastic organic material from an annular orifice in tubular shape and closing the leading end of the extruded plastic tube, applying fluid pressure within the plastic tube during extrusion and while the tube is still in a moldable state, and expanding the plastic material by means of the fluid pressure in conformity with the confines of a mold, thereby forming a hollow article.

"20. The process of making hollow articles from organic plastic materials which are expansible by fluid pressure and thereafter capable of being rigidified, which comprises closing the leading end of a tubular body of such material, extruding the closed-ended tubular body from an annular orifice, applying fluid pressure within the extruded closed-ended body while it is still in a moldable state, and expanding the closed-ended body by means of the fluid pressure into conformity with the confines of a mold, thereby forming a hollow article.

"21. The process of making hollow articles from organic plastic materials which are expansible by fluid pressure and thereafter capable of being rigidified, which comprises providing a mass of such plastic material in a state of workable plasticity, preforming a portion of said mass while in a state of workable plasticity into a closed-ended hollow body, expanding said preformed material in a mold by fluid pressure before the material thereof has been converted to a state of rigidity, rigidifying the expanded material in position in the mold, and separating the hollow article thus formed from the remainder of said mass.

\* \* \* \* \* \*

"23. The process of making blown hollow articles from organic plastic materials which are expansible by blowing and thereafter capable of being rigidified, which comprises preshaping a portion of a mass of such an organic plastic material, while in a plastic state, into a closed-ended hollow body, delivering said pre-shaped body before it has been converted to a state of rigidity and without substantial change of shape, into a mold, expanding said body to conform to the shape of the mold while it is still in a plastic state, rigidifying the expanded material in position against the walls of the mold, and separating the blown hollow article thus formed from the remainder of said mass.

\* \* \* \* \* \*

"26. The process of forming hollow articles from organic plastic material

which is expansible by blowing and thereafter capable of being rigidified, which comprises forming an expansible plastic blank from and integral with an unformed parent body of such material, expanding the blank by blowing in a mold prior to the rigidification of the material, and severing the article thus formed from the parent body of said material, the blown article thus formed being initially rigidified in situ in the mold."

Ferngren Patent No. 2,175,053 states:

(Page 1, column 1, line 1): "This invention relates to the making of containers or hollow articles from thermoplastic materials, which become plastic and partly fluid under heat and pressure and which in such condition may be extruded at predetermined temperatures, usually from 225 to 440 F., when acted upon by relatively high pressures, such as a pressure of 7,000 pounds per square inch, for liquefying the plastic material and relatively lower pressures as from 25 to 500 pounds square inch, for the extrusion of the liquified plastic material.

"The invention comprises a process in which a thermoplastic material is used, and comprises in part a form of pressure molding to produce a closed bottom or end wall for a tubular wall formation subsequently to be extruded. The bottom wall is formed for closing the lower end of a tubular body of material in a plastic condition, which may be considered a hollow blank and which is then progressively expanded by air admitted thereinto as the tubular wall portion is progressively extruded from a parent supply body of the plastic material. The hollow blank thus formed is surrounded by a forming mold and subsequently expanded by blowing to the shape of the mold.

\* \* \* \* \* \*

(Page 2, column 1, line 11): "The invention also comprises a process of producing articles such as containers, tumblers, drinking cups, jars or bottles from an extruded plastic material. In this connection the way of forming the bottom wall portions as an integral part of the vessel which is to be made is a novel procedure as is also the manner of severing the side wall of the vessel from the parent body of plastic material and of shaping a lip or bead on the upper end of such side wall.

\* \* \* \* \* \*

(Page 7, column 1, line 54): "The production of any container or vessel according to this process requires that the bottom wall portion of the vessel be the first portion produced and that thereafter the side walls and the mouth portion of the container be formed.

(Page 10, column 1, line 18): "The present application is a continuation in part of my applications Serial Nos. 658,486 and 16,864, filed Feb. 25, 1933 and April 17, 1935, respectively."

Claims 10 and 11 of this Ferngren Patent No. 2,175,053 are in suit. They are as follows:

"10. The process of forming a container from organic plastic material which is expansible by blowing and may thereafter be rigidified, comprising the steps of forming said material into a tubular body, closing one end of said tubular body, extruding the closed-ended tubular body into the position of a mold while applying pneumatic pressure within said body to prevent it from collapsing, and expanding said body when it reaches a predetermined position relative to the mold by increasing the pneumatic pressure therein until the plastic material conforms to the cavity of the mold.

"11. The process of forming a container from organic material which is solid at normal temperatures and which becomes plastic and moldable under heat and pressure, comprising the steps of subjecting the material in a comminuted form to both heat and pressure to convert it to a plastic and moldable condition, forming the material thus prepared into a tubular body closing the outer end of said tubular body, extruding the closed-ended tubular body into the position of a mold while applying pneumatic pressure within said body to

prevent it from collapsing, and expanding said body when it reaches a predetermined position relative to the mold by increasing the pneumatic pressure therein until the plastic material conforms to the cavity of the mold."

Ferngren Patent No. 2,230,188 states:

(Page 1, column 1, line 1): "This invention relates to a process of and apparatus for forming articles from plastic material, and more particularly to the forming of hollow blown articles, such as bottles, from organic plastic material which is temperature-sensitive and which at normal temperatures is hard, but which may be rendered fluent, plastic and moldable at elevated temperatures and thereafter may be rigidified in a suitable manner.

"The present invention is a continuation in part of my copending application, Serial No. 658,486, filed Feb. 25, 1933 now Patent No. 2,128,239 granted Aug. 30, 1938, and further is a continuation in part and in effect a substitute for my copending application, Serial No. 16,864, filed April 17, 1935, the latter case disclosing substantially all the essential elements herein disclosed.

"Among the objects of the present invention are to provide a process or processes and apparatus by which plastic material, and particularly organic plastic material, may be treated first to convert or bring it to a plastic and moldable condition, then to form it into an article of the desired shape, and more particularly to form it into a hollow blown article by a process including extruding the material from a suitable orifice of a nozzle as a closed-ended hollow body and thereafter blowing this body to conformity with the cavity of a suitable mold. The article thus formed must then be rigidified, by cooling, in the case of thermoplastic materials, such as cellulose acetate, or by some other process, for example, heating, in the case of thermo-setting materials, such as many condensation products now well known in the plastic art.

\* \* \* \* \* \*

(Page 10, column 2, line 30): "*End closing means.* After the plastic material has been formed into an article and that article severed from the parent body thereof within the nozzle, it is necessary to close the end of the tubular body of plastic material in the passage of the nozzle in some suitable way, so as to form a closed-ended hollow body of plastic material before the material may be expanded in the making of the next succeeding hollow blown article. This may be effected in a number of different ways, which will now be set forth.

"One way of closing the end of the hollow body of plastic material is to extrude a small amount of the material in tubular form from the nozzle and before the mold is at its upper position to close the space between the upper end of the mold and the nozzle, to cut a small portion of the end of the tubular body of plastic material from the remainder with a pair of hand scissors or shears. This causes the end portion of the tubular body being extruded to be closed together and to weld in view of the cohesive character of the plastic material, so that the closed-ended body may thereafter be extruded and expanded by internally applied pneumatic pressure to conformity with the mold cavity. I have had some experience with this process and have made bottles successfully in this way.

"Another possible method of closing the end of the tubular body of plastic material being extruded from the nozzle is to move the mold upwardly to such an extent that the lower end of the nozzle projects almost into contact or even into contact with the bottom of the mold cavity. When under these circumstances the plastic material is extruded from the nozzle in tubular form, it will mushroom against the bottom of the mold and weld itself into a closed-ended body. Thereafter the mold may be gradually moved downwardly so that in effect the nozzle is gradually withdrawn from the mold; and during this time the plastic

material may be extruded from the nozzle and expanded by the application of pneumatic pressure through the air passage of the nozzle. This manner of operation is taught generally in my co-pending application, Serial No. 658,486, now Patent No. 2,128,239 granted Aug. 30, 1938, of which the present case is a continuation in part, as above set forth.

"The plastic material may also be closed prior to the mold and nozzle moving relatively to the point where the nozzle moves to the bottom of the mold and in fact may be effected when operating according to a process in which the nozzle does not enter the mold cavity at all. This last operation is advantageous for certain purposes and may employ the shear blade itself as a baffle against which the plastic material may be extruded for closing the end thereof by a mushrooming action, similar to the action which takes place when the nozzle is adjacent to the bottom of the mold."

Claim 16 of this Ferngren Patent No. 2,230,188 is in suit. It is as follows:

"16. The process of forming a blown hollow article from organic thermoplastic material which is expansible by blowing and thereafter capable of being rigidified, which comprises heating such an organic thermoplastic material to bring it to a moldable state of plasticity, passing said plastic material into an elongate annular chamber under superatmospheric pressure, extruding a predetermined quantity of the plastic material in hollow form from said annular chamber, applying gaseous pressure within said extruded plastic material while it is still in a moldable state of plasticity and thereby expanding said plastic material into conformity with the confines of the cavity of a mold, thereby forming a blown hollow article, and introducing additional heated plastic material into said chamber for subsequent extrusion."

Kopitke Patent No. 2,349,177 states:

(Page 1, column 1, line 1): "This invention relates to the manufacture of blown plastic articles and the present application is a continuation in part of my prior application Serial No. 378,551, filed February 12, 1941.

"The general object of the invention is to provide an improved method and improved apparatus for producing blown plastic articles by first closing the end of a tube of plastic, forming therefrom a bubble of plastic material in a condition to be blown and then blowing the bubble in a mold of the desired shape. Articles made in this way are apt to have welds or scars thereon caused by the tube closing operation or by the severing of the preceding article or bubble from the tubular material. Also the material is apt to be undesirably thick at the bottom or at the top of the article. The purpose of this invention is to eliminate such defects.

"More particularly, it is an object of the invention to improve the appearance of extruded and blown plastic articles and the distribution of plastic in the articles by pinching or cutting off part or parts of the plastic bubble between the joints of the mold in which the article is to be blown, in order to eliminate the weld, scar or unduly thick portions of the bubble. This is accomplished by developing the bubble in such a way that it extends beyond the confines of the mold cavity so that parts to be removed are pinched by the mold, which may have special pinching or cutting edges for this purpose.

\* \* \* \* \* \*

(Page 1, column 1, line 55): "Pursuant to the invention, suitable plastic material, of which cellulose acetate molding compound is an example, may be formed into a bubble by forming a tube, closing its end and extruding it through an extrusion device, \* \*.

\* \* \* \* \* \*

(Page 1, column 2, line 28): "I have discovered that by pinching the plastic

bubble while it is quite soft and workable between the mold sections, as the mold is closed, defective portions may be eliminated and a better appearance and a much more uniform distribution of plastic obtained in the blown final article. In order to do this, the mold sections may be provided with blunt cutting or pinching edges, * * * which for convenience are made to extend around the entire periphery of the mold cavity, as shown in Fig. 3, although the plastic bubble may be pinched only at its upper and lower ends. The plastic bubble is then developed so that it will be caught between these edges when the mold is closed about it, as shown by Fig. 1, where the bottom of the bubble is below the edges at this point."

Claim 6 of this Kopitke Patent is in suit. It is as follows:

"6. The process of forming hollow articles from organic plastic material by blowing such material in a sectional mold which comprises, forming said material into an end-closed tube, developing and suspending said end-closed tube, in the form of a bubble and elongating the bubble so that an exterior portion of the bottom thereof projects beyond the cavity of the mold when the mold is closed about the bubble, closing the mold about the bubble and pinching in the joint thereof the exteriorly projecting bottom portion of the bubble and welding together the material of the bubble just inside the mold joint where said bottom portion of the bubble is pinched, and blowing the bubble into the shape of the mold cavity."

It has been observed that so-called "process" claims only are charged to be infringed. The complaint charges that the defendant has infringed the foregoing claims of said patents by practicing methods claimed therein for molding hollow articles from plastic materials, that said infringement has damaged plaintiff, and that it will continue unless enjoined.

The defendant, in its answer, denies infringement and avers that each of the patents is invalid and void. The defendant, in its answer, cites against each of the three Ferngren patents the following patents: Carpenter No. 237,168, issued February 1, 1881; Heist No. 1,654,647, issued January 3, 1928; Delpech No. 1,848,940, issued March 8, 1932; and Soubier, No. 1,981,636, issued November 20, 1934, on an application filed April 21, 1930. And, against the Kopitke Patent, the four patents just enumerated, together with Blair No. 1,780,330, issued November 4, 1930; Howard No. 1,995,276, issued March 19, 1935; Ferngren No. 2,128,239 in suit; Ferngren No. 2,175,053 in suit; and Ferngren No. 2,175,054 issued October 3, 1939. The defendant, in its answer, avers that at the times of the alleged inventions set forth in said patents it did not require invention but only the skill of a person skilled in the art to produce said alleged inventions; that the claims in suit cover a mere aggregation of steps and not a patentable process; that the claims in suit merely claim the function of a machine and not a patentable process; that Ferngren No. 2,175,053 and Ferngren No. 2,230,188 are invalid and void because of double patenting; that each of the patents in suit is invalid and void because its specifications and claims are vague and indefinite; and that, while the applications for the patents in suit were pending in the Patent Office, the applicants therefor so limited the claims of said applications that the plaintiff cannot now obtain constructions sufficiently broad to cover the process practiced by the defendant.

A consideration of the contentions of the parties as stated by their respective counsel in their opening statements may be helpful though they do not limit the issues. Counsel for the plaintiff, in his opening statement, said, in substance:

"Broadly speaking, the claims of the patents in suit relate to a method of producing blown hollow articles from organic plastic material which consists in an integrated process of plasticizing the material, partially forming the article by extruding it directly into a mold and completing the formation by blowing such tube into the shape of the

finished article. That concept is something which is entirely new in the art. No one prior to the advent of these inventors did that, as will become evident as the case proceeds.

"Perhaps the best exemplification of that is found in the prior art patents on which the defendant has indicated that it is going to rely. They relate to such different arts as glass art, celluliod art, rubber and gutta-percha art, cellophane art, glue art, and even the soap art; and I think our evidence will establish that no one of them teaches anything like the process that is involved before this court.

"Again broadly speaking, this method of these patents is carried on by roughly three steps:

"First, bringing the mass of plastic material to a condition of workable plasticity. This is accomplished by working the material under heat and pressure.

"Second, the hollow article is partially formed from a portion of that plasticized mass. This feature is accomplished by mechanically pre-shaping the material into a tube. Specifically, this mechanical pre-shaping is effected by pressure extrusion of the material through a die having an annular orifice, and the tubular body is delivered from that orifice directly into a mold having a cavity which defines the shape of the completed, finished article.

"Third, this preformed extruded body is distended or expanded into the mold by blowing, and is thereafter cooled or rigidified and then removed from the mold.

"I mentioned a moment ago, your Honor, that none of the prior art patents taught the steps here involved.

"I think another factor that we must have in mind in considering that question, and bearing upon what I had to say, is this, that the plaintiff in this case was really the first company to produce plastic bottles of the type here under consideration by means of that integrated process of tube extrusion and blow molding and making them in one piece. No one ever did it before, commercially at least. The Plax Company started to develop and commercially exploit the articles made by these processes about 1941, and at that time it had about 36 employes. Today, or as of last year, at least, they had about 440 employes. From 1942 to 1945, which as your Honor realizes was the war years, the total amount of business done by the plaintiff in this business was approximately $225,000. Last year the business done by the plaintiff amounted to in excess of $3,500,000. From 1942 to 1945 approximately 3,000,000 bottles or articles were produced by the plaintiff. In 1951 over 50,000,000 articles were produced. All this was accomplished with a relatively small number of salesmen out knocking on doors. For example, they started with one or two salesmen in 1942, and as of last year we only had ten. The amount of advertising that was done by the plaintiff was negligible, not to exceed at the most four to five per cent of the gross business. That industry recognized these patents is evident from the fact that up until the year 1948 the Plax Corporation did not have one competitor in the field and today only has two, that we know of: one, the defendant here; two, another concern in New Jersey that is concurrently being sued for infringement by us. So, under all those circumstances, your Honor, we submit that we have really here some patents which created an entirely new industry and made an entirely new business, and for that reason, at the conclusion of the case, we will ask for a judgment in our favor."

Counsel for defendant, in his opening statement, said, in substance:

"The defendant in this case is a relatively small manufacturer who worked out its own process of blowing plastic bottles, who took out its own patents, the first on a machine, Number 2,515,-093, July 11, 1950, and the second, No. 2,579,390, December 18, 1951, on the method of making hollow articles.

"The defenses in general are, first, no infringement, and, second, the patents as to the claims declared upon are invalid for lack of invention over the prior art.

"I believe my brother mentioned the fact that there were prior art patents on glass, gutta-percha, celluloid, and probably other plastic materials, which long preceded the particular material which is being used for these bottles now.

"A part of the popularity of the bottles is the material which has come into existence in recent years, and which is not mentioned in any of the patents of the plaintiff and is no invention of the plaintiff nor of the defendant. The plastic material which is available has made such bottles workable in that they are soft and yieldable and do not readily become brittle and discolored, or the like.

"The fundamental difference on which non-infringement is predicated is briefly this: that in all of the four patents—and, by the way, those four patents are hardly distinguishable in the method which they purport to cover —there is the necessity, as disclosed, of inserting a so-called parison or slug into the end of a mold and then blowing it. That is the plaintiff's essential method. That in all of the four patents is fundamentally the same. In the first patent, a nozzle deposits material inside of the mold and blows. In the second patent, material is formed in the shape of a closed-in tube really and blown down into a mold. In the third patent, material is extruded in the form of a hollow tube like this (indicating), stuck endwise into a mold. In this (fourth) patent a bubble is blown and the bubble is pinched between the two sides of the mold. But in every instance a certain amount of the material which is required to make a bottle is inserted into the mold. That is the plaintiff's picture fundamentally.

"In the defendant's device, process and device, material is extruded out of an extruding machine. The machine is old and the material is old. It is squirted out just like a piece of hose or piece of rubber tubing. Then the defendant's process is to come along and a mold closes on a section of it, another mold closes on another section, and so each mold seizes its proportion, its part of the required extruded material. Instead of sticking an individual charge into a mold, these molds grab this material as it comes out of the extruder, which is a totally different process. If your Honor cares to see the particular patents under which the defendant operates, I will hand them up to you.

"Remembering that in each of the four patents in suit, the material, a definite charge of material is introduced into a mold and then blown, the defendant's operation is briefly this: We squirt this material, this plastic material—it comes out straight—it goes into a die which comes around and closes on it. Another die comes up and closes on it. The actual operations are performed in a circle, that is to say, the plastic comes out here and is seized by this particular die and then it is carried around here and discharged. So the next die comes on and it is a continuous operation, in which the dies successively seize the right amount of material and then close completely on it. This diagram illustrates schematically the defendant's operations which are to close the mold. Then there is a needle in each one of these molds, a little hypodermic needle, which comes into the blowing lug or an extended part of this tube. If your Honor will examine, this is one of the samples taken out of a mold there, and it has this blowing lug with a little hole there which is where the hypodermic needle goes in. Inside that closed mold that needle goes in there and then air is released by a cam and it expands this tube into the bottle form. Then it starts to cool and it cools through a short period of time, and when the cooling is finished, then the inside air pressure is released and the bottle blank or

shape is released from the mold, and it is still sticking to the adjacent part simply because it isn't bitten off but continues out as a string. It comes out in parts like that, which are then very readily torn apart, so, and they have each their blowing lug just like the sample which your Honor has before you. These come off with the blowing lug still in place, thereupon the finishing operation is simply to cut off the lug. The blowing lug is a part which is on the one (bottle) in your right hand, which is not on the other. It is simply an extra part of the blank above the threads, which is useless. Its sole purpose is to permit the air to be introduced into the tube, which is rather thick-walled, and then to permit expansion of that section of the tube into the mold. After the mold is opened, you cut that off to finish, to form the bottle. In the defendant's operation that is a continuous formation of these bottle shapes. Whereas in the patents in suit, each individual operation requires that the bottle shape be cut off from the supply—that is to say, one of the problems in the plaintiff's operation on each case is to sever the bottle from the supply, since the supply and the mold must be tied together until the bottle is completely formed. That is not the case in the defendant's operation, where these shapes are simply spewed out, so to speak, and then finished later. In every case, in the plaintiff's operations, the blowing must occur through the material which is being supplied, the blowing must come down through here and expand the blank in the tube. That is true in all four patents. In the defendant's operation the blowing, of course, is an operation which is performed by the hypodermic needle entering the blowing lug and expanding the tube. One of the great problems which the plaintiff's patents make a point of is, of course, since they extrude from a nozzle into the mold individually, first they must close off the tube when it is extruded, when it is ready to be extruded into the mold, that

is, from the nozzle into the mold. In order to do that, they have various expedients which the defendant does not need because of the fundamental difference in mode of approach. That is to say, the defendant (plaintiff?) starts to extrude a tube and then it must close the end of the tube and then extrude further, and then blow and then cut off. Now, in the defendant's operations the extrusion is a continuous operation, and this extruder would work just the same whether the bottles were being made or weren't being made. As a matter of fact, the extruder is a simple commercial standard extruder for extruding bottles in two shapes, which, by the way, is an old art. The art of extruding plastic into a tube is very antique. There is no necessity for a special operation of closing before introduction into the mold, because the mold comes up to the tube and gets its share, its required share of the material.

"We rely upon the fundamental law of patents that when an accused operation does not conform in principle to the plaintiff's patent, there cannot be infringement, on the theory that if by words infringement could be manufactured, then there would be no limit to what each party could do with his particular patent monopoly. In the present case there is an attempt to use words to cover a substance of an entirely different character. We claim that the principle of the defendant's operations are such as to leave no community of inventive concept in the two operations. The claims must always be interpreted in the light of the specification as we take it in this case, and we are going to rely pretty heavily on that phase of the presentation of the defendant's case and show that there is no correspondence.

"On the question of invalidity, we will show that the patents in suit are for no more than applying a process old in other specific arts, for instance the art of glass blowing. Since these patents do not distinguish adequately in their specification from glass, although the

claims do say organic plastic, I take it, if the process is the same, the material to be operated upon does not distinguish the process, under the doctrine of Brown v. Piper [91 U.S. 37, 23 L.Ed. 200] line of cases, which, as your Honor recalls, was in brief that the transfer of an art or process to a different material does not necessarily constitute invention and, in fact, where the process is the same and the material is merely different, there can be no patent granted in a case like that.

"We call attention to the fact that the alleged processes of patents 239 and 188 are nothing but the functions of the machine. The plaintiff has significantly pointed to the fact that all its claims are process claims. The reason is obvious, that there is no possibility of any correspondence in machinery or in the principle of the machines employed. Therefore, the reliance must be placed upon the process, and in at least two of these patents, 239 and 188, the alleged process is nothing but the function of the machine.

"Claim 16 of patent 188 is an unpatentable aggregation of steps which have no relation to each other in the making of a bottle.

"Certain of these claims constitute double patenting, since all four patents in suit are directed to a single process of the defendant, and it is quite obvious that there must be a very remarkable invention which would constitute four different concepts of a single operation. We wish to show they are not four special operations, but they overlap and are one and the same thing with modifications.

"Certain of the claims are anticipated by the patents in the prior art.

"We claim furthermore that the basis of this suit is very largely the desire for a monopoly in plastic, such as has prevailed in the glass heretofore, and we believe that colors the situation very strongly. We will bring that out in testimony."

The defendant opened its closing argument by stating:

"The primary defense is that the defendant's process does not infringe. A secondary defense is that if the claims are so broadened as to cover the defendant's operations, they are invalid; and the third defense is that the claims declared upon are so invalid."

Accordingly, the court will follow its usual order and take up first the question of infringement. It is unquestionably true that if one compares the drawings of the machine whereby the defendant practices the process which it practices with the drawings of the patents in suit one may only with difficulty, if at all, find similarity. The machine whereby the defendant practices its process is different from the machines pictured in the patents in suit. But let us see what the defendant says about the difference between the two processes (Transcript p. 12):

"The fundamental difference on which non-infringement is predicated is briefly this, that in all of the four patents (in suit) * * * there is the necessity * * * of inserting a so-called parison or slug into the end of a mold and then blowing it. * * * In the first patent, a nozzle deposits material inside of the mold and blows. In the second patent, material is formed in the shape of a closed-in tube really and blown down into a mold. In the third patent, material is extruded in the form of a hollow tube * * * stuck endwise into a mold. In this (fourth) patent a bubble is blown and the bubble is pinched between the two sides of the mold. But in every instance a certain amount of the material which is required to make a bottle is inserted into the mold. That is the plaintiff's picture fundamentally.

"In the defendant's * * * process * * * material is extruded out of an extruding machine. * * * It is squirted out just like a piece of hose or piece of rubber tubing. Then the defendant's process is to come along and a mold closes on a section of it,

another mold closes on another section, and so each mold seizes its proportion, its part of the required extruded material. Instead of sticking an individual charge into a mold, these molds grab this material as it comes out of the extruder, which is a totally different process. * * *

(Transcript p. 18) "We rely upon the fundamental law of patents that when an accused operation does not conform in principle to the plaintiff's patent, there cannot be infringement, on the theory that if by words infringement could be manufactured, then there would be no limit to what each party could do with his particular patent monopoly. In the present case there is an attempt to use words to cover a substance of an entirely different character."

It may be helpful to determine, first, whether defendant's process is described by the wording of the claims in suit. If it is not described by the wording of a given claim, that claim can not be held to be infringed simply because the accused process is not described by the claim. On the other hand, if the defendant's process is described by the wording of a claim it may or may not infringe that claim, depending on whether or not it comes within the principle of the claim.

 In the opinion of the court, defendant's process falls within the wording of Claims 8, 19, 20, 21, 23 and 26 and it does not fall within the wording of Claim 7 of Ferngren Patent No. 2,128,239; it falls within the wording of Claims 10 and 11 of Ferngren Patent No. 2,175,053; it does not fall within the wording of Claim 16 of Ferngren Patent No. 2,230,188; and it falls within the wording of Claim 6 of Kopitke Patent No. 2,349,177.

Does defendant's process come within the principle of the claims within whose wording it falls? Let us revert for a moment to what the defendant said about "The fundamental difference on which noninfringement is predicated." Let us study that so-called "fundamental difference." In the process of the patents and likewise in the process of the defendant, organic plastic material is extruded from an annular orifice in tubular shape into a mold. The "fundamental difference" as pointed out by the defendant is this, that in the process of the patents the plastic material is extruded from a moving orifice into a stationary mold while in the process of the defendant the plastic material is extruded from a stationary orifice into a moving mold. In the court's opinion this is not a fundamental, or any difference. The process of the defendant is within the principle of each of the claims within whose wording it has been held to fall, and those claims are infringed by defendant's process.

The court has in mind that the defendant introduces air into the plastic tube in the mold through a so-called "hypodermic" needle. This method of introducing air is within the process claimed in the patents in suit, as is also the method of introducing air through the nozzle of the plastic extruder.

We come now to the question of validity. Considerable prior art was introduced by the defendant but its expert discussed only four of the patents introduced. They were: Armstrong No. 8180, issued June 24, 1851, for Improvement in making Guttapercha Hollow Ware; Soubier No. 1,981,636, issued November 20, 1934, on an application filed April 21, 1930, for Apparatus for Forming Hollow Glass Articles; Howard No. 1,592,299, issued July 13, 1936, on an application filed July 8, 1921, for Method and Apparatus for Making Blown Glassware; and Heist No. 1,654,647, issued July 3, 1928, on an application filed July 23, 1921, on Method for Making Hollow Articles. Of these four patents, Howard No. 1,592,299 was said to be defendant's best reference, or the reference which comes closest to disclosing the processes described and claimed in the patents in suit. This Howard Patent No. 1,592,299 was not pleaded in defendant's answer or amended answer. A witness, who after a formal technical education had spent a long lifetime working in the glass making art (a witness, by the way, extraordinarily well qualified to speak concerning matters relating to glass manufacture), testified, without contradiction, that the owner of the

Howard Patent No. 1,592,299, had spent $70,000 under the direction of the witness in the years 1929, 1930 and 1931, trying, without success, to produce a commercially salable product by the method disclosed in the Howard patent. The witness enumerated the difficulties encountered, and stated that, while they had been able to overcome some of the minor ones they had never overcome all difficulties, and had never made a bottle with a proper finish. The witness further testified that, as a result of the development work done on Howard No. 1,592,299 another patent—Howard No. 1,995,276,—was applied for. He further testified that they were not able to make a commercially salable bottle according to the methods disclosed in either patent. The witness produced and there were received in evidence photographs of the experimental equipment used by the witness.

Of the four patents discussed by defendant's expert on the trial, three were references cited in the Patent Office and over which the claims in suit were allowed. Howard No. 1,592,299 and Armstrong No. 8180 were cited by the Patent Office against Ferngren No. 2,128,239, and Soubier No. 1,981,636 was cited by the Patent Office against Kopitke No. 2,349,177.

Of the apparatus shown in Soubier No. 1,981,636 the witness aforesaid said that it was not a practical apparatus for making hollow glass articles for several reasons; 1st, The glass continues to issue through the orifice while the mold is closed and the tube is being blown, so that there will be a clogging of the freshly discharged glass at the top, resulting in a deformation of the lower end of the next article, and making the tubular section lopsided and spoiling distribution in the article; 2nd, To form a tube properly it should not be drawn from an orifice—it should be drawn from a mandrel or blow pipe; and 3rd, Another difficulty is in the squeezing up of the glass when the mold is closed. A recess is provided at 87 in Figure 8 so that glass may flow into it but glass is not so accommodating, it will go beyond the edges of the recess and nick the edge of the mold.

Another witness (a formally trained engineer, who had had great experience (24 years) in working with organic plastic material) testified, and the court believes truthfully, that he could not make a bottle from organic plastic material using the process disclosed in Howard No. 1,995,276; that he had tried and was unable to do so; that he had seen other people try to practice gob blowing, as taken from the glass art, and that they had been unable to do it; that he was not aware of anyone who was able to handle a plastic material by the blowing process and get any sort of workable article; that the reason is that the plastic material does not flow as a liquid as does glass; that the plastic material requires a certain amount of initial force to cause it to begin to move; that hot plastic material in a state of workable plasticity has a rather rubbery characteristic in that under relatively low stresses it behaves like an elastic solid instead of a liquid; this means that if one were to endeavor to form a gob of plastic material and started to blow on it, this is what would happen—In the first place, as pressure from the blow pipe is raised somewhat above the atmosphere, no blowing would take place at all up to a certain point; then, when the stress on the wall of the closed gob reaches and passes the yield point, the plastic begins to flow, but flows only at the point where the stress has passed the yield point, probably at the side of the gob, where there would be a blow out. This expert in the plastics field further testified:

"Q. Now, how long did you say you had been in the plastics field, Mr. Richardson? A. I first entered the plastics field on December 1, 1928.

"Q. Now, let us say in the year 1933, if you were seeking ways and means of developing an integrated process of extrusion and blow molding in plastics and you saw or came across the Howard prior art patent No. 1,-592,299, or the other Howard patent here in evidence, the last three numbers of which are, I believe, –276, or the Soubier prior art patent (No. 1,981,-636), what effect would that have on you, or what would you have done with

it, as a practical man in the art? A. At that time, knowing what I did about thermoplastic materials, and there were not very many of them available at that time, and knowing nothing about glass at that time, I would have taken an experiment to see whether it was possible to blow plastic materials by the methods used in the glass industry. And I would have found, as I now know, that such would have been entirely impractical, if not impossible, and would have looked no further in the glass art."

The court is satisfied that this witness' conclusions, as so expressed, are correct. Perhaps the writer will be permitted to interpolate that his views with respect to the matter lastly under consideration had done an "about face" since the beginning of the trial. When the opening statements of counsel gave the writer his first knowledge of the issues in this case the writer's thought was that these patents could not be valid, that what was being done with glass years ago was now being claimed with respect to organic plastic material, and that the making of containers of glass and the making of containers of organic plastic materials are in the same art. Those were the writer's thoughts. He is now satisfied that he was mistaken.

The witness lastly above referred to testified concerning Armstrong No. 8180, one of the four patents discussed by defendant's expert. The witness said, in substance:

"I have before me a copy of defendant's Exhibit L which was offered in evidence as illustrative of the operation of making gutta-percha hollow ware, as directed in the Armstrong patent. Figures 1 to 4, inclusive, of that chart show in a general way the steps of the process as practiced by Armstrong, but Figure 5 indicates a blown hollow article which is well formed in the mold. In my opinion, this process, if it is practiced in accordance with the sequence in Figures 1 to 4, inclusive, would not result in such a well formed expanded article, for the reason that the weld at the bottom of the tube, which is enclosed in the mold in Figure 4, would probably open up and split along the cleavage line, which is indicated at the point of pinching together. My reason for that is this: Gutta-percha is a very close relative of rubber. As a matter of fact, chemically, it is the same as rubber, although in somewhat different physical polymer chain formation, so that instead of being stretchy material, it is, at room temperature, a rather tough and more or less horny material. In fact, it is very similar in its room temperature characteristics to polyethylene. It is like polyethylene and hydrocarbon, being made up of only carbon hydrogen in its purified state. There are many grades of gutta-percha, which is a natural product, similar to natural rubber; and the best of those grades appear to have characteristics like polyethylene. Polyethylene, if it were extruded in this fashion, as shown in Figures 1, 2 and 3, and then closed at the end and introduced between the two halves of the mold, as in Figure 4, and water pressure introduced to the inside of it, I am quite sure that the weld at the point where the end was pinched together would break open. The reason for that is, the extrusion of the tubing causes an orientation of the long chain of molecules which make up the plastic—the gutta-percha in this case, or the polyethylene—and by pinching the two sides of the tube together to close it in this fashion, as shown in Figure 3, would not accomplish a sufficient weld to prevent it from opening up when the water pressure was applied to the inside of it. I think the same thing would apply with air pressure or with water pressure, in either case, keeping in mind the characteristics of hot plastics, with the yield point which I mentioned a while ago, even if the weld were to hold and the portion of the tube were to blow partially; it would blow out at the side and form an article which would be very thin on one side, and almost the thickness of the original tube well on the other side. "Also, in Fig. 3, I see a means for cut off, indicating the knives,

of what appeared to be a pair of pincers, which engages the tube and squeezes it together and severs it. And as called for in the patent: 'As the guttapercha pipe issues from the die of the machine in a heated state it is plastic and adhesive, so that the end can be closed by pressing it together. I then cut off a piece of the length required and insert it in a mold such as is used for molding glass, with the closed end downward, and after opening the upper end—'. Of course, the upper end was closed when the pincers pinched off the tube, it required that it be opened up, and we then applied the hydraulic pressure to the interior of it and caused it to be expanding. As these pincers cut off the portion of the tube which is to be used in the blowing operation, the other side of the pinch, where the pincers cut off would also be closed, and if the tube were subsequently extruded to make another blank for blowing, it would, instead of being as shown in Fig. 1, be closed-ended, and since there is no provision for introducing air to the interior of the closed-ended tube, further extrusion of it would cause it to collapse, since the only amount of air which is available inside of the tube, would be that trapped between the nozzle and the point of pinching off. Those are the fundamental difficulties with the process used by Armstrong, and those were the difficulties which were overcome in the process as worked out by Ferngren and, additionally, by Kopitke, in the patents in suit."

Defendant's expert was of the opinion that of the four patents offered in evidence Heist No. 1,654,647 best illustrated the defendant's process. He thought that it disclosed the continuous extrusion of a tube of organic plastic material, the bringing of separated mold halves into engagement with portions of the tube as it progresses forwardly, and the shaping of the tube after it has been enclosed in the mold into the shape of the mold but, as has been stated, he did not regard it as the best reference against the patents in suit. In Heist No. 1,654,647 the material used is soft vulcanizable rubber compound, plastic when it goes into the extruder and still plastic when the finished article is delivered by the apparatus. It is not "rigidified." The material as it comes from the extruder is in either open or closed sheets (the latter a wide tube). The two sides of the flattened tube engage the pair of co-operating mold halves. As the two wheels on which the co-operating molds are mounted rotate, the sides of the tube are brought almost into engagement with the complete mold rims. At this point, suction is introduced through the suction tubes leading into the molds and suction draws the respective sides of the flattened tube into intimate contact with the rims of the respective molds, thereby sealing them off. There is then a pressure differential between the cavities of the mold and the interior of the enclosed sheet or flattened tube. As suction is applied, and since the soft, pliable, doughy sheet of rubber compound is in contact all the way around the rims of each of the mold halves, the rubber compound is drawn downwardly in the lower cavity and upwardly in the upper one. Meanwhile the two wheels have continued in their rotation and the opening to the interior of the flattened tube, or closed sheet, as it is described in the patent, is closed thereby sealing off the interior of the so-called biscuit. This sealing off takes place slightly before the layer of rubber compound has met the curved surface of the mold halves, so that a partial vacuum is developed within the biscuit, the purpose of this being to allow easy release of the "biscuit" from the mold. As the wheels continue to rotate, carrying the molds into emptying position, the "biscuits" are released. The action in the process of Heist No. 1,654,647 is one of bringing a plastic material in sheet form against the rim of a suction mold, thereby sealing off that rim, so that the difference of pressure between the atmospheric side of the sheet and the suction side is sufficient to draw the soft rubber sheet down into the form of the mold. This action of sealing off between the surfaces of the sheet the outside flattened surfaces of the tube, which in so far as the molds are concerned is a sheet, is one of suction-forming or sheet-blowing and is

accompanied by a rotary sealing operation. In the case of the defendant's process the plastic material is extruded into the position of a mold, the mold is closed about it, sealing off the two ends of the tube which are engaged by the mold halves, and then blowing takes place through the blowing needle, causing the tube to expand to meet the confines of the mold. In the case of defendant's process, the mold contains a tube before it is blown, whereas in the case of Heist the halves of the mold are merely covered with a sheet which may be drawn down into the mold.

▉ In the court's opinion, the defendant does not follow Heist No. 1,654,647. Neither do Heist, Armstrong, Soubier or Howard anticipate the patents in suit.

Coming to the contention of the defendant that, at the times of the alleged inventions set forth in the patents in suit, it did not require invention but only skill of a person skilled in the art to produce said alleged inventions. This defense has not been sustained. The evidence discloses that no one was able, though they tried, to produce automatically hollow containers from organic plastic material, other than the plaintiff, and perhaps two others, all of whom used the patented process. The processes used in the glass and other arts would not make a satisfactory product when used in the plastic field.

The claims in suit and accompanying specifications are, in the court's opinion, sufficiently definite and cannot be said to be vague and indefinite.

The defendant contends that, in view of Claim 19 of Ferngren No. 2,128,239, Claims 10 and 11 of Ferngren No. 2,175,053 and Claim 16 of Ferngren No. 2,230,188 are each invalid because of double patenting. In order to study these claims and this contention the court has divided the claims into their elements as follows:

Claim 19 Ferngren Patent No. 2,128,-239:—

"The process of making hollow articles from organic plastic materials which are expansible by fluid pressure and thereafter capable of being rigidified, which comprises

"1. extruding such a plastic organic material from an annular orifice in tubular shape and

"2. closing the leading end of the extruded plastic tube,

"3. applying fluid pressure within the plastic tube during extrusion and while the tube is still in a moldable state, and

"4. expanding the plastic material by means of the fluid pressure into conformity with the confines of a mold, thereby forming a hollow article."

Claims 10 and 11 of Ferngren Patent No. 2,175,053:—

"10. The process of forming a container from organic plastic material which is expansible by blowing and may thereafter be rigidified, comprising the steps of

"1. forming said material into a tubular body,

"2. closing one end of said tubular body,

"3. extruding the closed-ended tubular body into the position of a mold while

"4. applying pneumatic pressure within said body to prevent it from collapsing, and

"5. expanding said body when it reaches a predetermined position relative to the mold by increasing the pneumatic pressure therein until the plastic material conforms to the cavity of the mold."

"11. The process of forming a container from organic material which is solid at normal temperatures and which becomes plastic and moldable under heat and pressure, comprising the steps of

"1. subjecting the material in a comminuted form to both heat and pressure to convert it to a plastic and moldable condition,

"2. forming the material thus prepared into a tubular body,

"3. closing the outer end of said tubular body,

"4. extruding the closed-ended tubular body into the position of a mold while

"5. applying pneumatic pressure within said body to prevent it from collapsing, and

"6. expanding said body when it reaches a predetermined position relative to the mold by increasing the pneumatic pressure therein until the plastic material conforms to the cavity of the mold."

Claim 16 of Ferngren Patent No. 2,230,188:

"The process of forming a blown hollow article from organic thermoplastic material which is expansible by blowing and thereafter capable of being rigidified which comprises

"1. heating such an organic thermoplastic material to bring it to a moldable state of plasticity,

"2. passing said plastic material into an elongate annular chamber under superatmospheric pressure,

"3. extruding a predetermined quantity of the plastic material in hollow form from said annular chamber,

"4. applying gaseous pressure within said extruded plastic material while it is still in a moldable state of plasticity and thereby

"5. expanding said plastic material into conformity with the confines of the cavity of a mold, thereby forming a blown hollow article, and

"6. introducing additional heated plastic material into said chamber for subsequent extrusion."

■ The court is of the opinion that Claim 10 of Ferngren Patent No. 2,175,053 may be said to represent double patenting. Elements 1 and 3 of this claim are the equivalent of element 1 of Claim 19 of the earlier patent, while elements 2, 4 and 5 of Claim 10 of the later patent are respectively the equivalents of elements 2, 3 and 4 of Claim 19 of the earlier patent. Said Claim 10 is accordingly invalid. Claim 11 of Ferngren No. 2,175,053 and Claim 16 of Ferngren No. 2,230,188 each contains elements additional to those of Claim 19 of

Ferngren No. 2,128,239. There is no double patenting in these claims.

■ As has been stated, the defendant, in its answer, sets up the defense that the claims in suit merely claim the function of a machine and not a patentable process. It is true, of course, that a machine may not be claimed by claiming its function. That is not attempted to be done in any of the claims in suit. Each one unequivocally claims a method which is fully described. As a matter of fact the only particulars of this defense specified in the defendant's final argument were set forth in the following language:

"Claim 16 of patent number —188" (Ferngren No. 2,230,188) "is clearly invalid on its face because it purports to be a process of forming a blown hollow article, but its steps involve forming such a hollow article and then filling up the machine for the next operation, which cannot be a consistent patentable concept, because when you blow one bottle that is a process concept, but when you fill the machine a second time, that is simply a function of the machine. This claim is for nothing more than the function of a machine. * * * Considered either as merely for the function of the machine or considered as for an aggregation of steps which have no patentable concept, the claim is invalid."

The court cannot concur in this reasoning. If an inventor believes there is some advantage to be had by including the first step of a second operation with the steps of a first operation in a process claim the court sees nothing in the law or reason which would prevent such inclusion, provided of course the claim is otherwise valid. Defendant's said contention is not sustained.

The general charge of the defendant in its answer "that, while the applications for the patents in suit were pending in the Patent Office, the applicants therefor so limited the claims of said applications that the plaintiff cannot now obtain constructions sufficiently broad to cover the processes practiced by the defendant" was, in the final argument, limited to apply only to

Kopitke No. 2,349,177. Defendant's argument on this point was limited. It consisted of no more than the following:

"Defendant's operations involve no bubble whatsoever, and it would be sufficient to rest the defense on that. However, the assertions of the plaintiff that a tube is the equivalent of a bubble for the purposes of infringement in this case, runs counter to the representations made by the attorneys for Kopitke in the application which resulted in this patent –177. There was some discussion in the course of the testimony as to what is a bubble.

"Well, I think, first of all, common sense tells us that it is a tube, and a tube is not a bubble.

"Second, if we go to the file history of this Kopitke patent, the fourth patent, in the action of December 29, 1942, the Examiner said the tube of Soubier—now, Soubier, if your Honor will recall, was the patent which had a piece of tube running down into the mold, so that when the mold closed it pinched the bottom of the piece of tubing, enough so that the blowpipe—this is the blowpipe principle as well—could expand the tube into the formation of an electric lamp bulb.

"In this action of December 29, 1942, the Examiner said: 'The tube of Soubier (Patent 1,981,636) is a bubble or equivalent when sealed as in the Soubier process.' To this holding, the applicant's attorneys took violent exception. They said 'Soubier *does not* form a bubble before the mold is closed. He does not close the end of the tube and then form a bubble, as recited in these claims. He does not weld the material together just inside the mold. A tube is not a bubble or its equivalent.' Now, if he was right then, he is wrong now, and vice versa."

An examination of the file wrapper of Kopitke No. 2,349,177 discloses that by the Patent Office action of December 2, 1941, the following proceedings were had:

"Claims 1, 2, 3 and 7 are rejected as substantially fully met by the patent to Soubier. The difference in material does not serve to distinguish the method.

"Claims 1, 2, 3 and 7 are further rejected as indefinite and functional. The claims should positively recite each step in the method. The claims should positively recite the step of suspending the bubble with the bottom portion projecting beyond the mold, pinching the bubble, etc."

In the argument answering the Office Letter of December 2, 1941, the applicant's counsel said:

"Claim 1, upon which claims 2 and 3 are dependent, and claim 7 have been amended and now recite positively the various steps of the method in such language that the invention defined can be clearly and accurately understood by those skilled in the art.

\* \* \* \* \* \*

"Claims 1, 2, 3 and 7 are believed to define a substantially different method from that shown in the patent to Soubier, for the reason that Soubier does not form a bubble before the mold is closed, but, on the contrary, flows out material in tubular form and pinches it in order to close the tubular material at its lower end to permit blowing of the material. Hence, Soubier does not disclose the step of closing the mold about a bubble and pinching a projecting part of a bubble in the mold joint. Also, Soubier does not disclose welding together the material of the bubble just inside the mold joint. See Fig. 8 of Soubier from which it appears that the material is welded together only within the mold joint.

"From the above it also follows that Soubier does not disclose a bubble, the bottom portion of which projects beyond the mold cavity, as recited in claim 2, nor a bubble, the upper portion of which projects beyond or is larger than the mold cavity and is pinched in the mold joint."

Patent Office action of December 29, 1942, discloses the following action:

"Claims 1–3 inclusive and 7 are again rejected as being unpatentable over the

patent to Soubier. The tube of Soubier is a bubble or equivalent when sealed as in the Soubier process. Obviously the top of the bubble as well as the bottom could be sealed if desired.

"Claims 1–3 inclusive and 7 are further rejected as being unpatentable over the patent to Soubier in view of the newly cited patent to Smith."

In the argument answering the Office Letter of December 29, 1942, the applicant's counsel said:

"Claims 1 to 3 and 8 and 10 have been amended and are resubmitted with claims 6 and 7 for reexamination with the request that due consideration be given to all the limitations in the claims in the light of the disclosure.

"Claims 1 to 3 now call for forming organic plastic material into an *end-closed* tube and *extruding said tube* and developing and suspending a bubble therefrom so that an *exterior* part of the bubble projects beyond the cavity of the mold when the mold is closed about the bubble, and closing the mold about the bubble and pinching an exterior part of the bubble between the joint thereof.

"These three claims are specific to welding the material of the bubble just inside the mold joint.

"Claim 2 requires that an exterior portion of the bottom of the bubble projects beyond the mold cavity and claim 3 that an exterior portion of the bubble is pinched in the joint when the mold is closed about the bubble.

"These claims along with claim 7 stand rejected on the patent to Soubier. The interpretation of this patent as set forth in the Official Letter cannot be accepted. Soubier *does not* form a bubble before the mold is closed. He does not close the end of the tube and then form a bubble, as recited in these claims. He does not weld material together just inside the mold. A tube is not a bubble or its equivalent. Soubier *does not* pinch his bottom portion because he has no bottom portion to pinch when the mold is closing.

"Soubier merely forms a tube, closes the mold about it and then blows the tube into a hollow article. The mold has a hole at the bottom which pinches the tubular material together as it closes. But as clearly shown in Fig. 8, the weld thus formed is in the mold joint and not just inside the mold joint. It remains as a defect in the article.

"The patent to Smith has been combined verbally with Soubier in an attempt to meet these claims. This is a far fetched rejection. Both patents are from the glass art and not available to those skilled in plastic art.

\* \* \* \* \* \*

"Those skilled in the plastics art did not have the benefit, prior to applicant's invention, of the unwarranted extension made by the rejection in the disclosure of Soubier's and Smith's glass working process and apparatus. Furthermore, it is well known that it is very difficult to weld organic plastics and welding is avoided where possible."

By Patent Office action of October 14, 1943, it was determined that:

"Claims 2, 5, 7, 8 and 10 appear at present allowable."

The applicant rewrote Claim 2 as Claim 11 and it became Claim 6 now in suit.

It has been observed that defendant's contention is based on the arguments of the applicant's counsel. Those arguments were two in number: First, that "a tube is not a bubble," and, second, that "patents in the glass art are not available to those skilled in the plastic art." The Patent Office acted, but on the faith of which argument we do not know. This seems to be an *excellent reason for refusing to sustain* defendant's contention, particularly when we bear in mind Judge Learned Hand's admonition in A. G. Spalding & Bros. v. John Wanamaker, New York, 2 Cir., 256 F. 530, 533, cited with approval by the United States Court of Appeals for the Seventh Circuit in Bassick Co. v. *Faultless* Caster Corp., 105 F.2d 228, 231, where he said:

"We take this occasion, however, once more to say that in the consideration of a file wrapper we do not look at the arguments of the applicant to the examiner. We wish it to be understood that, as we conceive the purpose for which the file wrapper can be examined, it covers simply the question of estoppels through rejected claims. The whole doctrine is somewhat anomalous at best, since it involves looking at preliminary negotiations in the interpretation of a formal document intended to be the final memorial of the parties' intentions. The practice, however, is too well settled for us to disturb, and we have no intention of casting any doubt upon it. This court, nevertheless, has twice already disapproved the practice of bringing into that interpretation the arguments of an applicant. Westinghouse Electric Co. v. Condit Elec. Mfg. Co., [2 Cir.], 194 F. 427, 430; Auto Pneumatic Action Co. v. Kindler & Collins, [2 Cir.], 247 F. 323, 328. We repeat now that disapproval."

The court does not want to labor the point, but the second of the two arguments of applicant's counsel was well founded in logic and fact, as abundantly appears from evidence in this case.

The court believes that it has covered each of the many contentions of the defendant except the final contention of the defendant in its opening statement, phrased as follows: "We claim furthermore that the basis of this suit is very largely the desire for a monopoly in plastics, such as has prevailed in glass heretofore and we believe that colors the situation very strongly. We will bring that out in testimony." That a patent grants a monopoly is hardly a reason for holding it invalid, and counsel, of course, did not intend to so contend. What counsel meant to suggest was that if the patents in suit are valid they grant a rather important monopoly (though for an exceedingly short time in the life of a civilization), and that being so the best interests of society require that the question of their validity in the light of the state of the art be con-

sidered with care. The best care of which the writer is capable has been bestowed, with the results hereinabove set forth.

Perhaps, before bringing this much too long memorandum to an end, mention should be made of the extraordinary commercial success that has come to the combination of the methods of the patents in suit and polyethylene. The combination has had a remarkable commercial success. The defendant would ascribe the success wholly to the polyethylene. The court is of the opinion that absent either the processes of the patents or the polyethylene, there would have been no commercial success so far as hollow containers (bottles) are concerned.

Counsel for the plaintiff may prepare and, on notice, within ten days, present, drafts of findings of fact, conclusions of law, and a judgment order consistent with the views hereinbefore expressed.