**PLAX CORPORATION, Plaintiff,**

v.

**PRECISION EXTRUDERS, Inc., and Lamex Chemical Corporation, Defendants.**

Civ. A. No. 22–51.

United States District Court
D. New Jersey.

Jan. 20, 1956.

William H. Campbell, Jr., Newark, N. J., for plaintiff. Synnestvedt & Lechner, by Alfred C. Aurich, Philadelphia, Pa., of counsel.

Harry B. Rook, Newark, N. J., for defendants. Mock & Blum, by Asher Blum, and Lester F. Dittenhoefer, New York City, of counsel.

MODARELLI, District Judge.

This is an action for the alleged infringement of claims in Patents No. 2,128,239 ('239 patent) and No. 2,230,188 ('188 patent). The '239 patent was applied for February 25, 1933, and issued August 30, 1938, to Enoch T. Ferngren, assignor to Plax; the '188 patent was applied for March 29, 1938, and issued January 28, 1941, to Ferngren, assignor by mesne assignments to Plax. Since the commencement of this action the defendant, Precision Extruders, Inc., has been dissolved and its assets were transferred to Lamex Chemical Corporation, which has been added as a defendant.[1] The patents and claims involved in this action previously have been involved in litigation. In Plax Corp. v. Elmer E. Mills Corp., D.C., 106 F.Supp. 399, the claims of the '239 patent involved in this case were held valid and infringed. As to Claim 16 of the '188 patent, the court did not specifically state that it is valid, although the court held it not infringed. Judge Barnes discussed Claim 16 at great length, and on page 416 of his opinion, column 2, next to the last paragraph, he seems to indicate clearly that he found it valid. That is the only inference that can be drawn from reading it because he pointed out (1) Claim 16 was not void for double patenting; (2) was not invalid as merely claiming the function of a machine; and (3) that it was sufficiently definite to meet all of the statutory requirements. Further support for that inference is found in his Finding XVII, 204 F.2d 302, at page 309 of the Court of Appeals' decision, which reads as follows:

"Neither the Heist, Armstrong, Soubier nor the Howard patents anticipates or renders invalid the four patents in suit."

One of the four patents in suit was the '188 patent; despite that fact there was no appeal taken relating to this patent.

At the pretrial conference, defendant limited to the four claims in suit its

---

1. Throughout this opinion the two defendants will be referred to as "defendant."

counterclaim based on the alleged invalidity of the entire patents.

The '239 patent relates to a process of blowing bottles and various other types of containers and shapes from materials in a plastic state. Claims 8, 21 and 26 are in issue.[2]

The '188 patent relates to a process of and apparatus for forming articles from plastic material, and more particularly to the forming of hollow blown articles, such as bottles, from organic plastic material which is temperature-sensitive and which at normal temperatures is hard, but may be rendered plastic at higher temperatures and thereafter may be suitably rigidified. Claim 16 is in issue.[3]

### Validity of the '239 Patent

The process disclosed in the patent is commonly known as the extrusion process, the forcing out from an opening under pressure by means of a screw-type extruder designed to transform plastic into a state of workable plasticity prior to its extrusion.

Cold plastic granules are placed in the funnel-like end extending vertically into one end of the horizontal extruder barrel. The plastic flows down into the barrel containing a screw which rotates. The rotating screw pushes the cold plastic into a heated zone of the extruder barrel; the plastic is compressed, thereby softening it. The plastic then is forced through a perforated plate, passing into the die-holder, downward into a tubular die containing an outside tube and a hollow inner tube. The die extends through the back of the die-holder so that air can be blown through the center of the core of the die. The plastic is extruded downwardly through the annular chamber which is formed between the outer sleeve of the nozzle and the inner core. Then the extruded tube is introduced into the mold and the tube begins to emerge from the nozzle. To close

2. "8. The process of making blown hollow articles from organic plastic materials which are expansible by blowing and thereafter capable of being rigidified, which comprises moving the plastic material while in a plastic state in tubular form into a mold of the shape of the finished article, bringing the end of the tube of plastic material into contact with the bottom of the mold to close the end of the tube, and applying fluid under pressure to the interior of the closed tube to distend the walls thereof and bring them against the walls of the mold."

"21. The process of making hollow articles from organic plastic materials which are expansible by fluid pressure and thereafter capable of being rigidified, which comprises providing a mass of such plastic material in a state of workable plasticity, preforming a portion of said mass while still in a state of workable plasticity into a closed-ended hollow body, expanding said preformed material in a mold by fluid pressure before the material thereof has been converted to a state of rigidity, rigidifying the expanded material in position in the mold, and separating the hollow article thus formed from the remainder of said mass."

"26. The process of forming hollow articles from organic plastic material which is expansible by blowing and thereafter capable of being rigidified, which comprises forming an expansible plastic blank from and integral with an unformed parent body of such material, expanding the blank by blowing in a mold prior to the rigidification of the material, and severing the article thus formed from the parent body of said material, the blown article thus formed being initially rigidified in situ in the mold."

3. "16. The process of forming a blown hollow article from organic thermoplastic material which is expansible by blowing and thereafter capable of being rigidified, which comprises heating such an organic thermoplastic material to bring it to a moldable state of plasticity, passing said plastic material into an elongate annular chamber under super-atmospheric pressure, extruding a predetermined quantity of the plastic material in hollow form from said annular chamber, applying gaseous pressure within said extruded plastic material while it is still in a moldable state of plasticity and thereby expanding said plastic material into conformity with the confines of the cavity of a mold, thereby forming a blown hollow article, and introducing additional heated plastic material into said chamber for subsequent extrusion."

the end of the tube, the plastic is extruded against the bottom of the mold, a suction at the inner core of the nozzle increasing the inward flow thereby helping to form a button-like end closing the tube. The tube is further extruded as the nozzle is withdrawn, leaving the closed end of the tube in contact with the bottom of the mold. Air is introduced to expand the tube to meet the confines of the mold. The pressure is retained inside the mold until the plastic is rigidified after cooling. Finally, the nozzle is removed, severing the blown article from the source of the supply, the two top members of the mold are raised, the split member is opened and the article falls to a position for removal by the operator.

The first step involved in Claim 8 of the '239 patent is that the plastic in tubular form is moved into a mold of the shape of the finished article; in step 2, the end of the plastic tube is brought into contact with the bottom of the mold to close the end of the tube; in step 3, pressure applies air to the interior of the closed tube to expand its walls against those of the mold.

The first step of Claim 21 of the '239 patent is heating the plastic to a point at which it will be workable; step 2 involves preforming a portion of the workable mass into a closed-ended hollow body; then in step 3, the preformed material is expanded in a mold by fluid pressure before the material has become rigid; in step 4, the expanded material is rigidified in position in the mold, which is done by holding the plastic wall formation of the bottle tightly against the inner face of the mold cavity in order to hold its shape during the setting of the plastic; in the final step, the formed hollow article is separated from the remainder of the mass, which is done by stopping extrusion of the material and holding the end of the nozzle until the bottle is set in the mold, then the nozzle is quickly retracted thereby pulling it from the hardened plastic.

The first two steps of Claim 26 are covered in the descriptions of Claim 8 and 21, except that the disclosure of initially rigidifying the article in situ in the mold is described in the patent as done by chilling the mold parts.

 Defendant's counterclaim alleges that the claims in issue are invalid. Defendant attempted to prove and has argued that its process follows Howard No. 1,592,299 applied for July 8, 1921, and issued July 13, 1926, for Method and Apparatus for Making Blown Glassware; Delpech No. 1,848,940 applied for December 1, 1926, and issued March 8, 1932, for Apparatus for the Blowing and Molding of Articles in Silica Glass; German Patent No. 321,223, published May 20, 1920, for Process for Making Pliant Tubes. Since defendant does not directly attack the validity of plaintiff's patent, apparently defendant's theory is that evidence relating to non-infringement is probative of invalidity. Even assuming the correctness of such a theory, the three patents cited by defendant relate to glass, and there is a difference between the art of making glass and the art of making organic plastic products. The testimony by plaintiff's expert, Mr. Richardson, has persuaded the court that in 1933, the year of the application for the '239 patent, in seeking a method of developing an integrated process of extrusion and blow molding in plastics, a person skilled in the art of plastics would have forsaken the glass art and would have looked somewhere else for guidance. His conclusion was based on his experiments, whereas, there is no evidence that the contrary conclusion by defendant's expert was based on any of his experiments. Moreover, defendant's expert testified that the Delpech and Howard Patents were the closest to its process. But they are inoperative, and an inoperative patent cannot be the basis for invalidating a later patent. Permutit Co. v. Harvey Laundry Co., 2 Cir., 1922, 279 F. 713, 718, certiorari denied 1922, 259 U.S. 588, 42 S.Ct. 590, 66 L. Ed. 1078; Consolidated Window Glass Co. v. Window Glass Mach. Co., 3 Cir., 1919, 261 F. 362, 363, 368, 369

No applicable prior art having been put in evidence, nevertheless, will Ferngren's contribution support the patent? In this Circuit, the test of invention is whether the change in the art disclosed by the patent would have been " * * * obvious at the time the invention was made to a person having ordinary skill in the art to which [the subject matter of the patent] pertains. * * * " Section 103 of the Patent Act[4]; Stanley Works v. Rockwell Mfg. Co., 3 Cir., 1953, 203 F.2d 846, 849, certiorari denied sub nom. Rockwell Mfg. Co. v. Stanley Works, 1953, 346 U.S. 818, 74 S.Ct. 30, 98 L.Ed. 345.[5] I find that Ferngren's disclosures meet the statutory test. I agree that it is " * * * clear from the evidence as to the experiments performed and the many unsuccessful attempts to devise a successful process for forming hollow articles from organic plastic materials that the plaintiff's development of the patented processes amounted to invention." Plax Corp. v. Elmer E. Mills Corp., 7 Cir., 1953, 204 F.2d 302, 310.

Defendant's other major arguments are: (1) Plaintiff concedes that " * * * it was old to extrude an organic plastic material under heat and mechanical pressure; and also to pinch one end of a hot plastic tube of organic plastic material, and then to expand the tube by internal air pressure in a mold cavity, in order to blow the tube to the shape of the mold cavity"; (2) the patent is inoperative if applied to defendant's process and use of polyethylene; (3) plaintiff never used its patent.

As for (1), plaintiff conceded only that it is old to extrude an organic plastic material under heat and mechan-ical pressure. As for (2), there is no evidence that such is the case. Mr. Temple, defendant's expert, whose trial demonstration of what purported to be plaintiff's process is now relied on by defendant as proof of inoperativeness, testified that he did not consider either patent inoperative. As for (3), there is no evidence that plaintiff never used its patent. In fact, men who have seen plaintiff's process in action testified in detail regarding the nature of that process and their descriptions are evidence that the process as actually used by plaintiff follows the patent.

*Infringement of the '239 Patent*

There is no controversy concerning the nature of the accused process used by defendant. It is described in a stipulation:

"In this operation a split mold is employed. The two mold halves are mounted with the plane of split disposed vertically, both mold halves being movable toward and away from each other horizontally to open and close the mold. The portions of the cavities in the mold halves for forming the neck of the bottles are located toward the top of the mold and are open through the top of the mold.

"A screw extruder is associated with the mold, with the axis of the screw and its surrounding barrel disposed horizontally. The extruder has a discharge head with a nozzle or die having an annular orifice presented downwardly at a location shortly above the top of the mold. The core of the die is hollow and extends downwardly approximately to

4. 66 Stat. 798, 35 U.S.C.A. § 103.

5. In Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, 535, Judge Learned Hand did not read the Stanley Works opinion as a holding that section 103 did not change the standard of invention. In his opinion he said, " * * * Moreover those decisions that have passed upon it [Sec. 103] have uniformly referred to it as a codification, al-though so far as we have found none of them has held that § 103 did not change the standard of invention." In Stanley Works, however, by way of dictum the court specifically said: "On its face Section 103 is merely a codification of decisional patent law. * * * " Since there is no indication by the Court of Appeals for this Circuit that it will follow the Lyon case, this court will follow the dictum of the Stanley Works case.

the plane of the lower face of the extruder die.

"Plastic molding powder is supplied to the feed hopper of the extruder, and the molding powder is there heated in a temperature range of 300°F.–450°F. and worked under pressure in the barrel of the extruder to a condition of workable plasticity in which the material may be forced under pressure through the discharge head and from the annular orifice of the nozzle or die to thereby extrude tubing in plastic condition.

"Surfaces of the mold halves are spaced below the lower face of the extruder die but are close enough to prevent blowing out of the plastic tubing between the mold and the extruder die.

"A control is provided on the extruder to provide for intermittent operation thereof and thus for intermittent extrusion of lengths of plastic tubing.

"In operation, beginning with the condition where the mold halves are separated, the operator starts the extruder and thereby extrudes a length of plastic tubing sufficiently long to project downwardly below the bottom of the mold cavity when the mold halves are closed.

"During extrusion of the tubing the interior of the tubing is open to atmosphere through the core of the die throughout the length of the tube, including the bottom. The extruder is stopped when the length of tubing just referred to has been extruded and thereafter the mold halves are brought together to enclose the extruded tubing in the mold cavity. Closure of the mold halves results in pinching and sealing closed the tubing adjacent its lower end, between narrow lands which are provided on the mold halves at the bottom of the mold cavity.

"The portion of the extruded tubing within the mold cavity is ex-

panded outwardly against the mold walls by introducing air under pressure through the hollow core of the die.

"The mold halves are provided with cavities for circulation of a cooling medium so that the mold halves are maintained at a temperature well below the rigidifying temperature of the plastic material.

"The internal air pressure introduced to expand the tube against the mold walls is maintained for an interval sufficiently long to permit the plastic material to at least partially rigidify by heat transfer to the mold walls.

"Thereafter the pressure in the bottle is released by connecting the die core passage with atmosphere, and the mold halves are then separated to permit removal of the formed bottle. To effect removal of the bottle the operator grasps the bottle and tears it from the plastic tubing which extends up into the nozzle or die. A finishing operation is subsequently applied to the bottle neck and the bottom of the bottle.

"The operator then again starts the extruder to extrude another length of tubing for the formation of another bottle and during this extrusion the interior of the tubing is open to atmosphere."

In plaintiff's process, the end of the tube is closed by bringing the end of the tube into contact with the bottom of the mold. As described by plaintiff's expert, to close the end of the tube the plastic is extruded against the bottom of the mold, a suction at the inner core of the nozzle increasing the inward flow thereby helping to form a button-like end closing the tube. In defendant's process, the end of the tube is not closed by bringing the tube into contact with the bottom of the mold. Plaintiff argues, however, that defendant's process includes closing the end of the tube *by using* the bottom of the mold. Such a contention is inconsistent with the de-

scription of defendant's process to which plaintiff stipulated: " * * * the mold halves are brought together to enclose the extruded tubing in the mold cavity. Closure of the mold halves results in pinching and sealing closed the tubing adjacent its lower end, between narrow lands which are provided on the mold halves at the bottom of the mold cavity." It cannot validly be argued that because the pinching is done *while the tubing is located* at the bottom of the mold that the bottom is an integral part of the step during which the tubing is closed. Additionally, one of plaintiff's experts admitted that plaintiff's process does not include the use of a split mold to pinch the tube into a closed end bottle.

What is the test of infringement of a process patent? Plaintiff argues that it is whether the apparatus, no matter how different it may be, will in its normal use perform the acts recited in the process claims; its method of closing the end of the extruded tube by forming a button or mushroom at the end of the tube is not called for in the second step of Claim 8 of the '239 patent, although it is recited as one of the steps in other claims of the '239 patent, which are not in suit. As for the latter argument, the second step of Claim 8 expressly discloses " * * * bringing the end of the tube of plastic material into contact with the bottom of the mold to close the end of the tube * * *." As for the more important argument by plaintiff, in Waxham v. Smith, 1935, 294 U.S. 20, 23, 55 S.Ct. 277, 278, 79 L.Ed. 733, the Court considered the question of infringement of a process patent relating to an improved apparatus and method for the incubation of eggs. The case involved only the method for incubation. The Court held that since the alleged infringing machine which carried out the method employed " * * * every essential of the patented method * * *" as defined by the claim, infringement could not be avoided merely by employing the patented method in a machine of different structure than the patentee's machine. Thus, the decisive ques-

tion is whether defendant's machine employs every essential of the patented method. One of the "essentials" of plaintiff's process is the use of the bottom of the mold as an integral part of the step for closing the end of the tube. Defendant has not employed that method of closing the end of the tube. Since its method differs from plaintiff's method, I find it has not infringed upon plaintiff's process. Claims 21 and 26 of the '239 patent do not expressly set forth the step concerning the method of closing the end of the tube. Nevertheless, because of the rule of interpretation set forth infra at pages 12–13 of this opinion [137 F.Supp. 501, 502], those claims also are not infringed.

### Validity of the '188 Patent

Defendant alleges in its counterclaim that Claim 16 of the '188 patent is invalid. Again, as in its attack against validity of the '239 patent claims, defendant's theory is that evidence relating to non-infringement is probative of invalidity. Its evidence of prior art to prove the invalidity of Claim 16 of the '188 patent is the same as its evidence to prove the invalidity of the adjudicated claims of the '239 patent. The court has set forth its reasons why the prior art relied on by defendant does not invalidate the claims of the '239 patent. Those reasons also apply to Claim 16 of the '188 patent, although it differs from the '239 patent in that Claim 16 discloses a repetitive process and the extrusion of a full charge of plastic before blowing.

As for the issue whether Ferngren's contribution as disclosed in Claim 16 will support the patent, the court's reasons above set forth relating to the '239 patent also apply to the '188 patent, which the court concludes is valid.

### Infringement of the '188 Patent

Is infringement of the '188 patent also avoided because of the different step used by defendant to close the end of the tube? The court believes so. Plaintiff argues that such a step is not

called for by Claim 16 so that the difference is irrelevant. In support of that argument, plaintiff cites Baker-Cammack Hosiery Mills, Inc., v. Davis Co., 4 Cir., 1950, 181 F.2d 550, 557, certiorari denied 1950, 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605; Western States Machine Co. v. S. S. Hepworth Co., 2 Cir., 1945, 147 F.2d 345, certiorari denied 1945, 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991; Kennedy v. Trimble Nurseryland Furniture, Inc., 2 Cir., 1938, 99 F.2d 786, 788; Girdler Corp. v. Abbotts Dairies, Inc., D.C.E.D.Pa.1938, 24 F.Supp. 551, 561, affirmed per curiam 3 Cir., 1939, 106 F.2d 998. Those cases do support the proposition that generally a limitation in claims not sued on should not limit claims sued on. "But this rule of construction of patent claims is entirely subordinate to the fundamental and controlling rule that a patentee's broadest claim can be no broader than his actual invention, no matter how it may be expressed or what other claims his patent may contain. When a patentee has fully and clearly described his actual invention in the specification and drawings of his patent, and has fully covered that invention by the broadest claim to monopoly which the law will allow him, he cannot then, by merely including in his patent a more broadly or more vaguely stated claim, cover and monopolize something more than and different from his real invention. * * *" Burroughs Adding Machine Co. v. Felt & Tarrant Mfg. Co., 7 Cir., 1917, 243 F. 861, 870, certiorari denied sub nom. Felt & Tarrant Mfg. Co. v. Burroughs Adding Machine Co., 1917, 244 U.S. 659, 37 S.Ct. 745, 61 L.Ed. 1376. Accord Kemart Corp. v. Printing Arts Research Laboratories, 9 Cir., 1953, 201 F.2d 624, 633. In Marks v. Polaroid Corp., D.C. Mass.1955, 129 F.Supp. 243, 257, the court held that the fact that the claims of the patent sued on were phrased in terms broad enough to cover portions of defendant's process was not sufficient to establish infringement. The court said: " * * * The claims are to be read in connection with the specifications, and a patentee's broadest claim can be no broader than his actual invention". Thus, since plaintiff's '188 patent is for a process of an apparatus for forming articles from plastic material " * * * and more particularly to the forming of hollow blown articles, such as bottles * * *," page 1, col. 1, line 3, even though Claim 16 does not expressly set forth the step by which the bottom of the tube is closed, the *invention*—a plastic bottle—disclosed in the specifications and drawings of the patent clearly requires the court to read Claim 16 in connection with the "actual invention." Additionally, the '188 patent clearly discloses an "End closing means." See page 10, col. 2, line 31. In the patent, there is a description of a number of different ways to close the end of the tubular body. One of those ways is " * * * to move the mold upwardly to such an extent that the lower end of the nozzle projects almost into contact or even into contact with the bottom of the mold cavity. When under these circumstances the plastic material is extruded from the nozzle in tubular form, it will mushroom against the bottom of the mold and weld itself into a closed-ended body * * *." The patentee noted that the step was taught generally in the '239 patent.

The court has considered the many other arguments of both parties, but in view of the foregoing opinion it is unnecessary to discuss or pass upon them.

Since I am abundantly convinced of the validity of the two patents in question, I don't feel that I should advert to their tremendous commercial success.

I, therefore, conclude that Claims 8, 21, and 26 of Patent No. 2,128,239 are valid and not infringed; and Claim 16 of Patent No. 2,230,188 is valid and not infringed.

The foregoing opinion shall constitute findings of fact and conclusions of law, as required by Rule 52, 28 U.S.C.A.

An order may be submitted in conformity with the opinion herein expressed.