**PLAX CORPORATION, Plaintiff,**

v.

**FLEXCEL CONTAINER CO., Inc., Imco Container Corp., and Injection Molding Co., Inc., Defendants.**

No. 7883.

United States District Court
W. D. Missouri, W. D.
Jan. 28, 1957.

C. Earl Hovey, Kansas City, Mo., for plaintiff.

Thomas E. Scofield, Morrison, Hecker, Buck, Cozad & Rogers, Kansas City, Mo., for defendants.

DUNCAN, Chief Judge.

The plaintiff is a corporation, organized and existing under the laws of the State of Delaware, having a regularly established place of business at Hartford, Connecticut. The defendants are corporations, organized under the laws of the State of Missouri, having a regularly established place of business within the jurisdiction of the United States District Court for the Western District of Missouri, Western Division. The plaintiff and the defendants are all engaged in the manufacture and sale of hollow blown plastic bottles or containers made of organic plastic material. Plaintiff is the owner, as assignee by mesne assignments of E. T. Ferngren, of:

U. S. Letters Patent 2,128,239 issued Aug. 30, 1938 for "Process of Molding Plastic Materials";

U. S. Letters Patent 2,175,053 issued October 3, 1939, same assignor, for "Process and Apparatus for Working Organic Plastic Material and Producing Containers Therefrom";

U. S. Letters Patent 2,230,188 issued January 28, 1941, same assignor, for "Process of and Apparatus for Forming Articles from Plastic Material";

U. S. Letters Patent 2,283,751 issued May 19, 1942, same assignor, for "Method and Apparatus for Forming Hollow Articles from Organic Plastic Material";

U. S. Letters Patent 2,669,752 issued February 23, 1954, from W. S. Pratt for "Molding Process".

It is alleged that defendants infringed Claims 8–21–26 of Patent '239; Claim 4 of Patent '053; Claims 16–18–25–33 of Patent '188; Claim 1 of Patent '751 and Claim 1 of Patent '752, and, as a result, plaintiff now seeks injunctive relief, costs, treble damages and attorneys' fees.

In their second amended answer and counterclaim, filed October 28, 1955, the defendants deny that any of the patents

were duly and legally issued, and allege that they are "invalid and void because the alleged inventions described and claimed therein, or substantial and material parts thereof, have been patented, described or published in various Letters Patent and printed publications prior to the alleged inventions and discoveries thereof" by Ferngren and Pratt, and cite twenty-two patents issued by the United States Patent Office from 1851 to 1941, eight foreign patents, and numerous publications and technical articles having to do with the plastic manufacturing art. They also allege double patenting.

Defendants state that the patents were "invalid and void because in view of the state of the art and what was common knowledge of those skilled in the art, prior to the respective dates of the alleged inventions of said patents, it required no invention whatsoever but only ordinary skill to produce the alleged inventions of the patents".

In addition to denying the validity of the patents, the defendants deny infringement, and by way of counterclaim, they ask declaratory judgment to determine these questions. They also allege that the defendant, Injection Molding Co., Inc., is the owner, as assignee of John R. Haines, of U. S. Letters Patent 2,632,202 issued March 24, 1953; that the plaintiff has infringed said patent by practicing the methods taught therein, and seeks damages and injunctive relief.

Included in the counterclaim were claims under §§ 1, 3, 7 and 8 of the Sherman Anti-trust Act, §§ 4, 7 and 16 of the Clayton Act, U.S.C.A. Title 15, §§ 1, 3, 7, 15 and note, 18, 26, 15 U.S.C.A. §§ 1, 3, 7, 15 and note, 18, 26, alleging a conspiracy between the plaintiff, Emhart Manufacturing Co., and the Owens-Illinois Glass Co., to violate the anti-trust laws aforesaid, and sought damages therefor. Prior to the conclusion of the trial, the defendants dismissed their count for alleged violation of the Anti-trust Act.

Claims 8–21–26 of Patent '239,[1] and Claim 16 of Patent '188,[2] among others,

1. Patent 2,128,239

Claim 8. "The process of making blown hollow articles from organic plastic materials which are expansible by blowing and thereafter capable of being rigidified, which comprises moving the plastic material while in a plastic state in tubular form into a mold of the shape of the finished article, bringing the end of the tube of plastic material into contact with the bottom of the mold to close the end of the tube, and applying fluid under pressure to the interior of the closed tube to distend the walls thereof and bring them against the walls of the mold.

Claim 21. "The process of making hollow articles from organic plastic materials which are expansible by fluid pressure and thereafter capable of being rigidified, which comprises providing a mass of such plastic material in a state of workable plasticity, preforming a portion of said mass while still in a state of workable plasticity into a closed-ended hollow body, expanding said preformed material in a mold by fluid pressure before the material thereof has been converted to a state of rigidity, rigidifying the expanded material in position in the mold, and separating the hollow article thus formed from the remainder of said mass."

Claim 26. "The process of forming hollow articles from organic plastic material which is expansible by blowing and thereafter capable of being rigidified, which comprises forming an expansible plastic blank from and integral with an unformed parent body of such material, expanding the blank by blowing in a mold prior to the rigidification of the material, and severing the article thus formed from the parent body of said material, the blown article thus formed being initially rigidified in situ in the mold."

2. Patent 2,230,188

Claim 16. "The process of forming a blown hollow article from organic thermoplastic material which is expansible by blowing and thereafter capable of being rigidified, which comprises heating such an organic thermoplastic material to bring it to a moldable state of plasticity, passing said plastic material into an elongate annular chamber under superatmospheric pressure, extruding a predetermined quantity of the plastic material in hollow form from said annular chamber, applying gaseous pressure within said extruded plastic material while it is still in a moldable state of plasticity and thereby expanding said

were involved in Plax Corp. v. Elmer E. Mills Corp., D.C., 106 F.Supp. 399; Id., 7 Cir., 204 F.2d 302, wherein the questions of validity and infringement were determined as to those claims by the District Court and the Court of Appeals for the Seventh Circuit. Claims 8–21–26 of Patent '239 and Claim 16 of '188 were contested in the District Court of New Jersey in Plax Corp. v. Precision Extruders, Inc., 137 F.Supp. 495. The questions of validity and infringement determined in the District Court were extended and amplified by the Court of Appeals for the Third Circuit in an opinion, 239 F.2d 792, by Judge Biggs, C. J.

Although Patent '752 is included in plaintiff's Complaint, no evidence was introduced with respect to it, and it may therefore, be considered as having been abandoned.

The patents and claims involved here are part of what apparently was a series of patents issued to Ferngren over a period of years, relating to the "Process of and Apparatus for Forming Articles from Plastic Material" or for forming hollow pastic containers from organic plastic material.

All of the claims in the patents involved here, and the processes adopted by both plaintiff and defendants, involve the placing of polyethylene crystals into a chamber where they are heated to a state of workable plasticity, and thereafter are extruded from said heating device by means of pressure through a nozzle or diehead in the form of a tube, thereafter to be molded into the form of the article desired.

The three claims of Patent '239 clearly state that the "plastic material while in a plastic state in tubular form" is blown into a mold, such material coming "into contact with the bottom of the mold to close the end of the tube". Thereafter, fluid is applied "under pressure to the interior of the closed tube to distend the walls thereof and bring them against the

walls of the mold" thus forming the tube into the desired shape.

The only distinction I am able to find between Claims 8 and 21, is that 21 provides for separating the hollow article from the remainder of the mass. Claim 26, to me, represents a repetition of the process provided in 8 and 21. Claims 8, 21 and 26 were in issue in the District Court in Chicago, in which Judge Barnes wrote a well considered and exhaustive opinion describing the various processes of the patents, and held those claims to be valid. In this respect, his findings were affirmed by the Court of Appeals in Plax Corp. v. Elmer E. Mills Corp., 7 Cir., 204 F.2d 302. Claims 8, 21 and 26 were also before Judge Modarelli in Plax Corp. v. Precision Extruders, Inc., supra, wherein he held these claims valid and not infringed.

The same expert witness (Richardson) testified in both cases, and the leading counsel for plaintiff, (Mr. Aurich) appeared for plaintiff. Judge Modarelli described the process disclosed in the patent, which description the Court of Appeals accepted, and which I adopt in this action [137 F.Supp. 497].

"Validity of the '239 Patent"

"The process disclosed in the patent is commonly known as the extrusion process, the forcing out from an opening under pressure by means of a screw-type extruder designed to transform plastic into a state of workable plasticity prior to its extrusion.

"Cold plastic granules are placed in the funnel-like end extending vertically into one end of the horizontal extruder barrel. The plastic flows down into the barrel containing a screw which rotates. The rotating screw pushes the cold plastic into a heated zone of the extruder barrel; the plastic is compressed, thereby softening it. The plastic then is

plastic material into conformity with the confines of the cavity of a mold, thereby forming a blown hollow article and introducing additional heated plastic material into said chamber for subsequent extrusion."

forced through a perforated plate, passing into the die-holder, downward into a tubular die containing an outside tube and a hollow inner tube. The die extends through the back of the die-holder so that air can be blown through the center of the core of the die. The plastic is extruded downwardly through the annular chamber which is formed between the outer sleeve of the nozzle and the inner core. Then the extruded tube is introduced into the mold and the tube begins to emerge from the nozzle. To close the end of the tube, the plastic is extruded against the bottom of the mold, a suction at the inner core of the nozzle increasing the inward flow thereby helping to form a button-like end closing the tube. The tube is further extruded as the nozzle is withdrawn, leaving the closed end of the tube in contact with the bottom of the mold. Air is introduced to expand the tube to meet the confines of the mold. The pressure is retained inside the mold until the plastic is rigidified after cooling. Finally, the nozzle is removed, severing the blown article from the source of the supply, the two top members of the mold are raised, the split member is opened and the article falls to a position for removal by the operator.

"The first step involved in Claim 8 of the '239 patent is that the plastic in tubular form is moved into a mold of the shape of the finished article; in step 2, the end of the plastic tube is brought into contact with the bottom of the mold to close the end of the tube; in step 3, pressure applies air to the interior of the closed tube to expand its walls against those of the mold.

"The first step of Claim 21 of the '239 patent is heating the plastic to a point at which it will be workable; step 2 involves performing a portion of the workable mass into a closed-ended hollow body; then in step 3, the preformed material is expanded in a mold by fluid pressure before the material has become rigid; in step 4, the expanded material is rigidified in position in the mold, which is done by holding the plastic wall formation of the bottle tightly against the inner face of the mold cavity in order to hold its shape during the setting of the plastic; in the final step, the formed hollow article is separated from the remainder of the mass, which is done by stopping extrusion of the material and holding the end of the nozzle until the bottle is set in the mold, then the nozzle is quickly retracted thereby pulling it from the hardened plastic.

"The first two steps of Claim 26 are covered in the descriptions of Claim 8 and 21, except that the disclosure of initially rigidifying the article in situ in the mold is described in the patent as done by chilling the mold parts."

Judge Modarelli also discussed the prior methods and apparatus alleged to have been used in the glass industry, and which it is contended by the defendants here, render the plaintiff's patents invalid. He particularly discussed many patents which had been pleaded by the defendants as anticipating plaintiff's patents. Most of these patents dealt with the glass manufacturing art, and both Judges Barnes and Modarelli held that the industries were not analogous. The Judge concluded that plaintiff's claims were valid.

"I find that Ferngren's disclosures meet the statutory test. I agree that it is ' * * * clear from the evidence as to the experiments performed and the many unsuccessful attempts to devise a successful process for forming hollow articles from organic plastic materials that the plaintiff's development of the patented processes amounted to invention.' Plax Corp. v. Elmer E. Mills Corp., 7 Cir., 1953, 204 F.2d 302, 310."

In this respect I am in accord with clusions, but I do feel that the broad Judges Barnes and Modarelli in my con-

concept of the patents relating to the plastic industry are to be found in the glass industry. Likewise, I believe that the evidence clearly reveals that the same methods used in the glass industry would not be successful in the plastic industry since glass, being an inorganic plastic, is distinguishable from the organic plastic with which we are now dealing. To liquefy glass requires a temperature in excess of 2000° whereupon it will flow freely. In the case of organic plastics, however, materials become plasticized at a much lower temperature (300 to 450°), and do not liquefy to the same extent as glass. Plastic becomes semi-liquefied and requires some pressure to cause it to flow sufficiently in extrusion from the melting apparatus.

I believe that one skilled in the art of making glass would find much valuable background in that art, at least as a starting point, for his studies of the plastic manufacturing art. I make this observation believing that such a relationship between the arts, although they are different, would legally necessitate a narrower construction to be placed upon the claims of the patents dealing with the plastic manufacturing art.

The process used by defendants in the Precision case was stipulated and included in the court's opinion, as follows:

" 'In this operation a split mold is employed. The two mold halves are mounted with the plane of split disposed vertically, both mold halves being movable toward and away from each other horizontally to open and close the mold. The portions of the cavities in the mold halves for forming the neck of the bottles are located toward the top of the mold and are open through the top of the mold.

" 'A screw extruder is associated with the mold, with the axis of the screw and its surrounding barrel disposed horizontally. The extruder has a discharge head with a nozzle or die having an annular orifice presented downwardly at a location shortly above the top of the mold.

The core of the die is hollow and extends downwardly approximately to the plane of the lower face of the extruder die.

" 'Plastic molding powder is supplied to the feed hopper of the extruder, and the molding powder is there heated in a temperature range of 300°F.–450°F. and worked under pressure in the barrel of the extruder to a condition of workable plasticity in which the material may be forced under pressure through the discharge head and from the annular orifice of the nozzle or die to thereby extrude tubing in plastic condition.

" 'Surfaces of the mold halves are spaced below the lower face of the extruder die but are close enough to prevent blowing out of the plastic tubing between the mold and the extruder die.

" 'A control is provided on the extruder to provide for intermittent operation thereof and thus for intermittent extrusion of lengths of plastic tubing.

" 'In operation, beginning with the condition where the mold halves are separated, the operator starts the extruder and thereby extrudes a length of plastic tubing sufficiently long to project downwardly below the bottom of the mold cavity when the mold halves are closed.

" 'During extrusion of the tubing the interior of the tubing is open to atmosphere through the core of the die throughout the length of the tube, including the bottom. The extruder is stopped when the length of tubing just referred to has been extruded and thereafter the mold halves are brought together to enclose the extruded tubing in the mold cavity. Closure of the mold halves results in pinching and sealing closed the tubing adjacent its lower end, between narrow lands which are provided on the mold halves at the bottom of the mold cavity.

" 'The portion of the extruded tubing within the mold cavity is expanded outwardly against the mold walls by introducing air under pressure through the hollow core of the die.

" 'The mold halves are provided with cavities for circulation of a cooling medium so that the mold halves are maintained at a temperature well below the rigidifying temperature of the plastic material.

" 'The internal air pressure introduced to expand the tube against the mold walls is maintained for an interval sufficiently long to permit the plastic material to at least partially rigidify by heat transfer to the mold walls.

" 'Thereafter the presure in the bottle is released by connecting the die core passage with atmosphere, and the mold halves are then separated to permit removal of the formed bottle. To effect removal of the bottle the operator grasps the bottle and tears it from the plastic tubing which extends up into the nozzle or die. A finishing operation is subsequently applied to the bottle neck and the bottom of the bottle.

" 'The operator then again starts the extruder to extrude another length of tubing for the formation of another bottle and during this extrusion the interior of the tubing is open to atmosphere.' "

This process was found not to infringe the plaintiff's claims both by Judge Modarelli and by the Court of Appeals. Plax Corp. v. Precision Extruders, D.C., 137 F.Supp. 495; Plax Corporation v. Precision Extruders, Inc., 3 Cir., 239 F. 2d 792, decided by Judge Biggs, January 3, 1957. The process used by defendants in this case was likewise stipulated and appears in the record as follows:

"The extruder mechanism which is used by defendant is a horizontal screw type extruder (1). Plastic molding powder granules are fed to the extruder from a hopper (not shown) at the inlet end of the extruder barrel. In the barrel of the extruder, the plastic granules are subjected to heat [and pressure] to bring the plastic into a state of workable plasticity, *after which it is directed to conduits by an extruder screw.*

"At the outlet end of the extruder barrel the plastic passes through a valve. The valve is actuated by a rack (2) and pinion (3) and a compressed air cylinder (4). In one position the valve directs the plastic into a conduit (6) which extends horizontally to the right of the extruder barrel and in the other position the valve directs the plastic into a similar conduit (7) which extends horizontally to the left of the extruder barrel.

"Each conduit leads to a separate extrusion crosshead or diehead (8 and 9). Both dieheads are similar in construction and comprise a vertically disposed sleeve (10), and a mandrel (11) is positioned within the sleeve, thereby providing an annular chamber in the diehead to receive plastic from the extruder. The mandrel is provided with a central bore or air passage (12). Air under pressure is periodically supplied to the central bore at the upper end thereof through hose connections (13) and a valve chest (not shown). At their lower ends the internal bore of the sleeve and the mandrel taper inwardly and terminate in an annular downwardly presented orifice (14) from which the plasticized plastic material is delivered in tubular form of a desired diameter and wall thickness. The extruder barrel and dieheads are heated by electric resistance heating elements (H).

"A mold assembly (15–15′ or 16–16′) is associated with each of the dieheads. The molds are of the split mold type, and as to a given mold, the two mold halves are mounted with the plane of the split disposed

vertically. Both mold halves are movable toward and away from each other horizontally to open and close the mold in accordance with a desired periodic sequence.

"The portions of the cavity for forming the neck (17) of the bottle are located toward the top of the mold and are part of an opening (18) through the top of the mold.

"The mold halves are provided with internal cavities or chambers (19) and are fitted with connections (20–20') enabling the circulation of a cooling medium through the mold so that the mold halves are maintained at a temperature well below the rigidifying temperature of the plastic material.

"When a mold is in a closed position (16–16' in Fig. 2 and Fig. 6), the mold opening (18) is aligned with the annular orifice (14) of the extrusion die and the outer upper surface of the mold halves (21) is spaced below the lower face (22) of the diehead but is close enough to the diehead to prevent blowing out of the plastic tubing between the mold and the diehead (as can be seen in Figs. 5 and 6).

"A compressed air actuated knife assembly (23) is associated with each mold and diehead for separating the blown hollow article from the parent mass of plastic in the extruder mechanism after the molds have been opened. The knife assembly is positioned at the side of each mold and includes as the knife member a strip of flexible sheet metal 24–24'). A compressed air piston (25) periodically moves the knife member in a direction upwardly and towards the extrusion orifice so that it engages the under face of the diehead at a point to one side of the extrusion orifice. The knife member is flexible and upon being moved in a direction toward the extrusion orifice it bends and slides across the lower face of the diehead to completely sever and

separate the blown article and any tubing which has been extruded from the plastic material remaining in the diehead or nozzle. After the severing operation is completed the knife is retracted to enable extrusion of another length of tubing, and closing of the mold in subsequent operations.

"In operation, the two-way valve at the extruder barrel outlet is set to direct plastic material to one of the extruder dieheads. The mold for the diehead to which the plastic has been directed is in an open position. A length of plastic tubing sufficiently long to project downwardly below the bottom of the mold cavity is then extruded from the diehead.

"When the length of tubing just referred to has been extruded, the two-way valve at the extruder barrel outlet is shifted to direct plastic to the other diehead, thereby stopping extrusion from the first diehead. The mold halves below the first diehead are then closed (Fig. 5) upon the extruded length of tubing. Closure of the mold halves about the tubing results in a pinching and sealing closed of the lower end [portions] of the tubing (26) between narrow lands (27–27') which are provided on the mold halves at the bottom of the mold cavity.

"The portion of the extruded tubing within the mold cavity is then expanded outwardly against the mold walls by introducing air under pressure through the hollow mandrel (Fig. 5 and Fig. 6). The internal air pressure introduced to expand the tube against the mold walls is maintained for an interval sufficiently long to permit the plastic material to at least partially rigidify by heat transfer to the mold walls which are cooled by circulation of a cooling medium through the internal chambers or cavities in each of the mold halves. Thereafter, the mold halves are opened and the knife mechanism, as previously described, severs the

blown hollow article from the *plastic in the conduit through which said plastic is supplied to the mold cavity, the plastic in the conduit having been severed previously from the* parent mass of plastic material [.] in the extruder (1) by valve (3). The severed article drops to a conveyor belt which carries it away from the [extruder] mold.

"During the forming of the hollow article in the first mold assembly, a length of tubing is being extruded from the second diehead and then the same sequence of operations follows with respect to the second mold. When the predetermined length of tubing has then been extruded for the forming of the second article, the valve is shifted to again direct plasticized plastic to the first diehead and extrude another length of tubing sufficient to make a blown hollow article in the first mold.

"This cycle of operation is repeated with substantially continuous operation of the extruder mechanism, with successive discharge of measured quantities of softened plastic for the formation of separate articles, and with intermittent blow molding of such articles in the mold assemblies [associated with] *which receive plastic through conduits (6) and (7)* from the extruder.

"A finishing operation is subsequently applied to the bottle neck and to the bottom of the bottle in order to remove excess and unnecessary plastic material."

I find, little distinction between the description of the process involved in

**3.** Patent 2,175,053

Claim 4. "In the making of individual articles from organic plastic material of a cohesive nature, the process which comprises providing a discharging supply body of such material in a flowable plastic state and in a quantity sufficient for the making of several of said individual articles, intermittently discharging at regular successive intervals

the Precision Extruders case and the process used by the defendants.

Paragraph 10 of the defendants' process in the Precision Extruders provides for the removal of the bottle from the parent body, by a "tearing" operation from the plastic tubing which extended into the nozzle or die, whereas, in Flexcel's process, this is done by a shearing operation. Also in the Extrusion process after the finished bottle is "torn from the parent body"—"The operator then again starts the extruder to extrude another length of tubing", while in the accused process, the extrusion operation is not stopped during the removal of the bottle, but is automatically transferred to another nozzle or die.

For these reasons, the process adopted by the defendants is not the same as that taught in '239 and therefore, does not infringe.

### Claim 4 of Patent '053

■ Claim 4 [3] of Patent '053 has four distinct steps, as described in plaintiff's exhibit 35, modified drawing. The first step is:

"providing a discharging supply body of such material in a flowable plastic state and in a quantity sufficient for the making of several of said individual articles,"

Step 2:

"intermittently discharging at regular successive intervals predetermined quantities from said body and

Step 3:

"forming an article of hollow form from each of said quantities,

Step 4:

predetermined quantities from said body and forming an article of hollow form from each of said quantities, and intermittently replenishing said body by adding thereto at successive regular intervals each of which is equal to one of the first named intervals additional fluent material in quantities each equal to one of those discharged to form an article."

"and intermittently replenishing said body by adding thereto at successive regular intervals each of which is equal to one of the first named intervals additional fluent material in quantities each equal to one of those discharged to form an article."

Certainly the first step is not new in the process of manufacturing hollow plastic articles. We find the same process followed in '239. Step 2 is simply a different means of doing the same thing followed in Step 1. That is, the discharging of the plasticated material in its liquid form at successive intervals in predetermined quantities, rather than in a continuous flowing state. Step 3, forming the hollow article from the material is not new. Step 4, "replenishing the said body by adding thereto at successive regular intervals each of which is equal to one of the first named intervals additional fluent material in quantities each equal to one of those discharged to form an article" apparently is a new process.

The process taught in '239 provides for the extruding of a continuous tube from the extruder or nozzle into the mold until a sufficient amount has been extruded to fill the mold, and then severing the extruded portion from the parent body; while the process here is to discharge a quantity of material from the supply body into the channel where it is maintained in a properly heated and liquefied form, and thereafter extruded from such chamber in predetermined quantities. Richardson described the process in this manner:

" 'The supply body' in the Flexcel operation is provided in the same way that this body is provided as taught by the Ferngren patent. Ferngren prepares the material introduced into a rotary hopper, by subjecting it to heat and pressure in the ram or plunger plasticator-extruder. Flexcel accomplishes this in the screw type plasticator-extruder.

"From the plasticator-extruder, as taught by Ferngren, the material is passed through a valve-controlled passageway into a chamber 131, and in the patent the material in this chamber is specifically designated the supply body."

It would thus seem that as the process continues, the amount of material discharged into the chamber from which it is extruded through the diehead by means of a plunger is extruded in quantities sufficient to form one or more articles, and the supply is automatically replenished from the supply body. In connection with this claim, the specifications, state:

"Another object is to provide a system of replacement of the plastic material in process in the apparatus, so that all portions of the semi-liquid supply of plastic material may progress continuously through the apparatus and be progressively and substantially continuously replaced by the addition of freshly liquefied or softened material at a series of equally spaced supply points. In connection with this system it is also an object preliminarily to compact and preheat the material so that it may be softened before being acted upon by high pressure and heat for rendering it softly plastic or semi-liquid, and thereafter to maintain the conditioned material under pneumatic pressure and heat in a supply chamber of small size until it is extruded therefrom into a tubular passage or annular space where it is exposed constantly to heat and intermittently to extrusive pressure before or during ejection, delivery or propulsion through and out of said passage."

As I understand the teaching of this claim, the material is preheated in what might be referred to as the "plasticator" in patent '239, and thereafter delivered into the chamber at regular intervals in quantities sufficient to make a number of hollow articles. It is then reheated or

kept at the proper temperature in this chamber and extruded by means of a plunger forcing the desired predetermined quantity in this chamber through the diehead and into the mold. The "plasticator-extruder" as we have heretofore referred to it, apparently has no part in extruding the predetermined quantities from the chamber through the diehead and into the mold as is done in '239. This statement becomes significant, and will be referred to again when the question of infringement arises.

As heretofore stated, most steps in Claim 4 are not new. I think however, that it is new and not taught in '239 * * * to deliver the plasticated material into the chamber such as described here, in predetermined quantities, and thereafter extruded by means of a plunger in predetermined quantities through the diehead. It would seem that these well known elements, when combined, teach a new and different process from the process taught in '239, and that therefore, the combination of elements are patentable. I so conclude.

### Infringement

We next come to the question of infringement. Plaintiff contends that the process followed by Flexcel is the equivalent of the process described in Claim 4. With this contention, I cannot agree. The method followed by the defendants has heretofore been described in the language of the experts, but in language that I can understand, it is simply this:

The granules are delivered into the chamber, where they are heated and by means of a screw extruder the semiliquid material is forced out of the chamber through a channel to what might be designated as a wye, or the center of a yoke where a valve is provided. At the termination of each end of the yoke there is a nozzle or die, and as the plasticated material is extruded by means of the screw extruder, through the annular chamber to the diehead, liquefied or air pressure is supplied which causes the material to be extruded through the die-head into the open space between divided molds. When the desired amount has been extruded (this has been determined by means of a timing device), the valve through which the material has been passing to the diehead closes, and the parts of the divided mold closes or comes together on the open-ended extruded tube, thus sealing it, and thereafter air is forced into it thus forming the desired article in accordance with the interior form of the closed die. When the valve closes, the plastic material is extruded into the other annular chamber and through the diehead in identically the same manner, thus by continuous operation of this type, the articles are formed. The plastic material is continuously extruded from the heating device by means of the screw extruder into one diehead or the other.

The valve which controls the flow of material in defendants' device is simple. (Defendants' Exhibit 29 is an exact duplicate of the valve used by them). It is composed of a tapered spindle set into a block through which the channels leading from the extruder to the respective dieheads pass. There are two openings in the spindle 90° apart and extending to the center thereof, corresponding in size to the openings in the channels. When the valve is adjusted so that the material is being extruded therethrough to the left diehead, the opening into the right diehead is closed. When the desired amount of material has been supplied through the open channel the valve automatically turns 90°, closes that channel and opens the other. Except for the very short space of time required to turn the valve 90° to close one channel and open the other, there is no stoppage in the flow of material from the extruder. There is no intermittent discharging or predetermined amount sufficient to make one or more articles into a chamber where it is retained, heated and extruded by means of a plunger through the diehead into the molds. This is not an equivalent but a different process from that described in the claim of the patent, and does not infringe.

In Plax Corp. v. Elmer E. Mills, D.C., 106 F.Supp. 399, only Claim 16[2] of Patent '188 was in issue, and the District Court held that in so far as the defendants' process did not fall within the wording of Claim 16, there was no infringement of that claim. In affirming the ruling, (204 F.2d 311), the Court of Appeals did not consider the validity or invalidity of the claim since the District Court's action precluded that issue from being before the court.

Likewise, Claim 16 (but not 25 and 33) was in suit in Plax v. Precision Extruders, D.C., 137 F.Supp. 495. Judge Modarelli held Claim 16 valid for the same reasons he gave in holding '239 valid, and also for the further reason that Claim 16 disclosed a repetitive process and the extrusion of a full charge of plastic before blowing. He also held that the claim was not infringed. On appeal, 239 F.2d 792, 796, the court reversed the finding of the lower court as to validity and held that the claim was void for double patenting of a single inventive process, holding that the "steps involve a difference in mechanics rather than a difference in process". Plax v. Precision Extruders, supra:

■ Although not binding upon the courts of another circuit, the opinion of an appellate court of another circuit is persuasive as to the correctness of its conclusions. It seems to me that if the appellate court's finding of invalidity of Claim 16 for double patenting over the claims of '239 is correct, then all process patents subsequent to '239 must be void for the same reason. A study of the claim together with the specifications, its relation to other claims and the simplified drawings of plaintiff's Exhibits 31 and 33, and defendants' Exhibit 9, reveal a process which is not found in '239 and that such "repetitive process" results in a patentable difference. In this I agree with Judge Modarelli, and conclude that the claim is valid. I think that the discussion with respect to Claims 18 and 33, although they are apparatus claims, will further strengthen such finding.

### Claims 18 and 33 of Patent '188

■ As heretofore stated, Claims 18 and 33[4] of Patent '188 are both apparatus claims.

The patentee recites that:

"The present invention is a continuation in part of my copending application Serial No. 658,486, filed Feb. 25, 1933 now Patent No. 2,128,-239 granted Aug. 30, 1938, and further is a continuation in part and in effect a substitute for my copending application, Serial No. 16,864, filed April 17, 1935, the latter case disclosing substantially all the essential elements herein disclosed."

There are six steps in Claim 18.

1. "An elongate tubular nozzle.

2. "Means for passing such a plastic material into said tubular

---

2. See note 2 on page 706.

4.     Patent 2,230,188
   Claim 18. "Apparatus for forming blown hollow articles from organic plastic materials which are expansible by blowing and thereafter capable of being rigidified, which comprises an elongate tubular nozzle, means for passing such a plastic material into said tubular nozzle under superatmospheric pressure, an annular extrusion orifice at one end of said tubular nozzle so constructed and arranged that the plastic material may be extruded therethrough without substantial change in shape, means for positively applying superatmospheric pressure to the plastic material to extrude it from the nozzle, means for applying gaseous pressure within the extruded plastic material to expand it by blowing, and a mold co-operating with said nozzle to receive and form the extruded blown plastic material."
   Claim 33. "Apparatus for forming articles from organic plastic material, comprising continuously operating means for bringing said material to a plastic and moldable condition, and intermittently operating extrusion and distending means for receiving plastic and moldable material from the first-named means and for forming it into the desired articles."

nozzle under superatmospheric pressure.

3. "An annular extrusion orifice at one end of said tubular nozzle so constructed and arranged that the plastic material may be extruded therethrough without substantial change in shape.

4. "Means for positively applying superatmospheric pressure to the plastic material to extrude it from the nozzle.

5. "Means for applying gaseous pressure within the extruded plastic material to expand it by blowing, and

6. "A mold cooperating with said nozzle to receive and form the extruded blown plastic material."

Again we find this is a mechanism for performing the same function as that provided for in '239 and '053. And, again it seems to me that all of the elements employed here are found in the other patents. They are regrouped and employed for the purpose of performing the same function in a different and more satisfactory manner.

As in Claim 4 of '053, the plasticized material is heated in a plasticator, which, apparently, from the simplified drawing, is placed horizontal to the elongate tubular nozzle, and the material is then forced by means of pressure in the plasticator, through a valve into an annular chamber. When an amount sufficient to fill the upper portion of the elongate tubular nozzle has been forced from the plasticator, the valve closes, according to Exhibit 32 simplified drawing, and a second valve opens through which the material flows into a lower annular extrusion orifice at the end of the tubular nozzle through which the material may be extruded without substantial change in shape.

When the amount of material which has passed through the first valve and into the upper chamber, and the valve through which it has passed therein has closed, the flow of material stops. The second valve opens and the material is extruded by means of a plunger in a predetermined quantity, through the nozzle. When the material has been so extruded, the lower valve closes, the upper again opens and the upper annular chamber refills and so continues the process and the mechanical operation. I find no comparable apparatus for carrying out the process taught in prior patents. Such apparatus represents patentable difference and both claims are therefore valid.

### Infringement

In discussing the question of whether or not Claim 16 was infringed by the defendants' process in Plax v. Precision Extruders, Judge Modarelli thought that it was not, and gave the same reasons upon which he concluded that the claims in '239 had not been infringed, i.e., the different method of closing the open-ended tube. The plaintiff extruded the tube into the bottom of the open mold thus forming the closed end of the bottle, whereas the defendants' process provided for closing of the end by means of the pressure of the double mold. It seems to me that there is a more substantial difference than that found by Judge Modarelli.

The process taught by Claim 16 provides for the delivery of the material from the horizontal plasticator through a valve into an annular chamber. After the annular chamber has been filled, the valve leading from the supply body thereto is cut off and the amount so deposited in the annular chamber is extruded by means of the plunger type extruder through the lower annular chamber in a predetermined quantity. When the upper valve is open, and the material passed through into the upper chamber, the valve through which it has passed has closed, and the second valve opens. During all of this period, the upper valve has been closed. When the amount of material has been extruded from the annular chamber, the upper valve opens and the material is again supplied from a supply body. We find no comparable process in defendants' operation. That has been fully described heretofore, and

I find no reason for again describing it in connection with this process claim.

It Is Therefore my conclusion that the defendants' process does not infringe Claim 16.[2]

Claim 18 provides the apparatus, i.e., a valve leading from the horizontal extruder into the annular chamber through which the plasticated material passes under superatmospheric pressure, and is separated from the parent body by the closing of the valve; thereafter employing a second valve, removed from the first, which opens, and through which the material is extruded by means of a horizontal plunger through the tubular nozzle into the shaping mold. This has been described on page 17 of this opinion and need not be further explained. The defendants employ but one valve of an entirely different mechanical structure. It is an entirely different structure or apparatus which performs the function in an entirely different manner. To me, there is far greater difference between both the method and the apparatus of the defendants' and the plaintiff's method and apparatus than there is between the various methods and apparatus of the plaintiff's various patents.

It Is Therefore my conclusion that the defendants' apparatus does not infringe Claim 18 of Patent '188.

### Claim 33 of Patent '188

Claim 33 of Patent '188 is rather simple, and is an "Apparatus for forming articles from organic plastic material, comprising—

1.—"Continuously operating means for bringing said material to a plastic and moldable condition, and

2.—"Intermittently operating extrusion and distending means for receiving plastic and moldable material from the first-named means and for forming it into the desired articles."

Without going into the details of the methods and the apparatus, it is a part of the same apparatus described in Claim 18, and for the same reasons I have set out there, it is my conclusion that it is valid, patentable and does not infringe.

### Claim 1 of Patent 2,283,751

■ The next claim is 1, of Patent '751 which again is a method claim, and is as follows:

"The method of forming a hollow article from organic plastic material, comprising extruding a hollow tubular body portion of such material in a plastic and moldable condition from an annular extrusion orifice, closing the end of the extruded portion of material by positively applying uniform pressure to predetermined areas on opposite sides thereof to weld such areas together, and severing a portion of the extruded material along a shear line disposed at the boundary of said area distant from the extrusion orifice."

It is the contention of the plaintiff that the sealing of the ends of the extruded open tube by the closing of the molds, as used in defendants' process, infringes this claim. Considering the wording of the claim alone, there is no provision as to when and where the closing process of the extruded portion shall take place, but read in connection with the specifications and a description of the methods to be used in carrying out the teachings of this claim, it seems to me it clearly reveals the method intended by the patentee to be followed. As I read it and understand it, the closing process is to take place immediately after the tube emerges from the extrusion nozzle. Patentee states:

"Among the objects of the present invention are to provide a novel method and apparatus for closing the leading end of an extruded tubular body of organic plastic material, which is in a moldable condition, *adjacent to the orifice of an extrusion nozzle preparatory to the continued extrusion of the closed-ended*

718

*tubular body, which is thereafter developed into the desired article."* (Emphasis supplied.)

Again the patentee states:

"A further object of the present invention is to provide apparatus for controlling the application of fluid pressure to the inside of a closed-ended hollow body of organic plastic material being extruded from a suitable nozzle as aforesaid for supplying a fluid pressure medium at a relatively low pressure *during the extrusion of the closed-ended hollow body of plastic material from the nozzle to prevent the collapse thereof,* while supplying the fluid pressure medium at a relatively higher pressure subsequent to the completion of the extrusion proper in order to expand the closed-ended hollow body previously extruded to conformity with a mold cavity." (Emphasis supplied.)

While the language last quoted applies to the apparatus or the device designed to bring about the closing of the tube, the description thereof clearly indicates that the process is to take place at the end of the nozzle, and that the tube shall thereafter be extruded from the chamber as an enclosed tube, so that when it reaches the mold and the pressure is applied to bring it into the form desired, the end has already been closed.

This process is entirely different from that employed by the defendants. As described earlier in this opinion, the process employed by the defendants is to extrude the open-ended tube between the divided molds, until it reaches a space slightly below the lower end of the open molds, and when they come together, the pressure closes the end of the tube thus sealing it after the extrusion process has ended, and before the pressure is exerted to form it into the desired shape within the mold. There is no cutting off of any part of the extruded end until after the tube has been sealed, completely molded, severed from the parent body, and the divided molds are separated. The severance of the so-called "tab" from the end of the completed bottle in the defendants' process is a finishing operation that is done separate and apart from the operation of any mechanical device or process described in the claim. It is in these respects that the defendants' process differs from that of the teaching of the patent, and the claim does not infringe.

Therefore, it is my conclusion that the claim is valid, and not infringed.

Claims 1 of Patent '752 and 25 of Patent '188.

Claim 1 of Patent '752 was abandoned at the trial, as was claim 25 of Patent '188.

Counterclaim

We next come to the defendants' counterclaim. The defendants are the owners of Patent 2,622,202 referred to throughout as '202, the application for which was granted March 24, 1953, to John R. Haines, and through assignment, is held by the defendants.

"The invention disclosed in this application relates to machines for and methods of forming hollow plastic articles and filling such hollow plastic articles immediately after they are formed."

"A further object of my invention is the provision of a combination of devices for continuously supplying plastic to a plurality of molds from a single plastic extrusion machine in which the individual molds operate in sequence so that the flow of plastic from the extrusion machine is substantially continuous.

"A feature of my invention is the provision of a hollow plunger formed with a tapered end operating within a tapered outlet for a cylinder forming a part of the mold delivering portion of the diehead.

"A further feature of my invention is the provision of a cam for controlling the operation of the plunger controlling at each instant the amount of plastic being delivered from the diehead.

"A further feature of my invention is the provision of a pinion nut, and a rack for controlling the position of the plunger which itself controls the amount of plastic delivered by the diehead to a mold."

The defendants filed their second amended answer and counterclaim shortly before the case was at issue, in which they alleged the infringement of their patent by the plaintiff's device known as "G–2". Prior to the filing of the counterclaim, the defendants had inspected the plaintiff's plant and its machinery, and thereafter filed their counterclaim.

Initially, we may say that this patent was granted in a very crowded field, and a good many years after the initial spade work had been done in the plastic field. There wasn't very much left, either from the standpoint of process or apparatus that hadn't been anticipated by other patents, and for that reason, the claims must be given a narrow construction.

The Answer alleged infringement of claims 1–2–5–6–7–9–10 and 12. Later the defendants withdrew claims 5–6–7. Claims 1–2–9–10 are apparatus claims, and 12 is a process claim. In their brief the defendants say that "Claim 1 is typical and may be analyzed into its elements as follows:

"1. A machine for forming shaped articles of plastic material comprising

"(1) a die head having walls and a central space within said walls having an outlet portion formed with a tapering throat;

"(2) a longitudinally bored mandrel in the central space of said die head formed with a tapered end portion normally positioned in said tapered throat;

"(3) mechanism for moving said mandrel in either direction lengthwise of said die head to constrict or enlarge the annular opening surrounding said mandrel within the tapered portion of said die head in accordance with any predetermined

pattern and for preventing movement of the mandrel other than by the said mechanism;

"(4) means for supplying air under pressure to the bore of said mandrel;

"(5) and means for supplying plastic under superatmospheric pressure to the space between the walls of said die head and said mandrel concurrently with and at a time in the cycle of operations of the machine coordinated with a movement of the mandrel lengthwise of said die head."

Simply stated, the machine operated by the plaintiff comprises two dieheads which are arranged above "a rotatable mold carrier or turret upon which are mounted four split molds, each mold having two cavities making it capable of molding two articles simultaneously." The plasticated material is extruded from the die into the molds, and when the process has been completed, the timing device causes the turret to move and the process is repeated in another set of molds. There are four double molds on the table. In their brief the defendants make this statement:

"The sequence of steps performed in the molding of the articles is not as important to the issue of infringement as is the valve mechanism which controls the flow of plastic from the extruders to the dieheads."

The defendants' process and apparatus have heretofore been described several times in connection with other patents. The only difference I find between the apparatus now employed by the defendants and the Haines patent is that instead of having one valve which automatically opens and closes to supply material from the extrusion chamber to the dieheads, there are two, one on each branch or arm of the yoke, as shown in defendants' simplified drawing, Exhibit 43. So far as the dieheads are concerned, the substantial and material difference between the plaintiff's machine G–2, and the patent process used by the

defendants, is that both the extrusion head and the molds remain stationary, there being a diehead for each mold, whereas in the accused device there are two dieheads supplying four double molds, the molds revolving periodically in accordance with a predetermined timing element to receive the extruded supply from the diehead. They accomplish the same purpose, but in an entirely different manner.

As suggested by the plaintiff, I find nothing in the description of plaintiff's machine G–2 comparable to the defendants' moving mandrel which seems to move up and down to control the annular opening surrounding the mandrel within the tapered portion of the diehead, thus determining the thickness of the walls of the tube as it is extruded from the die.

Certainly there is as much difference between the plaintiff's G–2 machine and the teachings of the Haines patent as there is between the methods and apparatus used by the defendants, and the methods and apparatus employed by the plaintiff generally with respect to its various patents.

Therefore, the plaintiff's machine does not infringe defendant's claims 1–2–9–10. No. 12 is a process patent, and there is nothing new in its teachings that isn't to be found in many of the other patents. It is likewise not infringed.

### Summary

Summarizing, I find and conclude that Claims 8, 21 and 26 of Patent 2,128,239 are valid and not infringed.

I find and conclude that Claim 4 of Patent 2,175,053 is valid and not infringed.

I find and conclude that Claims 16, 18 and 33 of Patent 2,230,188 are valid and not infringed.

I find and conclude that Claim 1 of Patent 2,283,751 is valid and not infringed.

I find and conclude that plaintiff's process does not infringe defendants' Patent 2,632,202.

I believe that the Findings and Conclusions set out in this opinion are sufficient, but, if the parties desire to submit additional Findings and Conclusions, they may do so within ten days.